UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

ERIC CASEY,

                              Plaintiff,

                                                    9:13-cv-01271

v.
                                                    (DNH/TWD)

M. BROCKLEY; H. COLVIN; A. MAYO; C.
GOODRIC; S. WANNIGER; H. CLAPPER;
T. HERMANCE; C. BOYCE; S. RACETTE,

                              Defendants.

─────────────────────────────────────────

APPEARANCES:                          OF COUNSEL:

ERIC CASEY
Plaintiff, *pro se*
77 Crescent Avenue
Unit 6
Jersey City, New Jersey 07304

HON. ERIC T. SCHNEIDERMAN            BRIAN W. MATULA, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

This *pro se* civil rights action commenced pursuant to 42 U.S.C. § 1983 by Plaintiff Eric

Casey, formerly an inmate in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"), has been referred for Report and Recommendation by the

Hon. David N. Hurd, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local

Rule ("L.R.") 72.3(c).

Plaintiff commenced this action on October 15, 2013, alleging violations of his constitutional rights during his confinement at Great Meadow Correctional Facility.  (Dkt. No. 1.)  Plaintiff's amended complaint, the operative pleading, was accepted for filing on January 25, 2016.  (Dkt. No. 52.)  The claims include: (1) Eighth Amendment excessive force claims against Defendants Colvin, Mayo, Goodrich, Wanniger; and Racette; and (2) Eighth Amendment deliberate indifference to medical needs claims against Defendants Boyce, Clapper, and Hermance.  Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 71.)

Defendants seek summary judgment on the following grounds: (1) Eighth Amendment excessive force claims against Defendants Brockley, Mayo, Goodrich, and Wanniger should be dismissed because such claims are barred by *Heck v. Humphrey*, and because no reasonable jury could believe Plaintiff's factual account; (2) Eighth Amendment excessive force claims against Defendant Racette should be dismissed because Plaintiff has failed to establish the requisite personal involvement on his supervisory liability claims; (3) Eighth Amendment deliberate medical indifference claims against Defendants Clapper, Boyce, and Hermance should be dismissed because Plaintiff has failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, and because Plaintiff has failed to raise a question of fact as to the claim.  (Dkt. No 71-1.)  Plaintiff has responded in opposition to the motion.  (Dkt. No. 79.)

For reasons explained below, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 71) be granted in part and denied in part.

## I.     BACKGROUND

Prior to May 22, 2013, Plaintiff had issues with Officer DeSantis who harassed him by allegedly fabricating a disciplinary report, permitting inmates to steal from him, and directing other officers to assault him.  (Dkt. No. 52 at 6[1].)  In response, Plaintiff filed formal grievance GM-54867-13 (Dkt. No. 52-1 at 11) regarding Officer DeSantis' conduct and requested protective custody.  *Id.*  In the grievance, Plaintiff also offered an officer-witness who was willing to testify regarding Officer DeSantis' dislike for Plaintiff.  (Dkt. No. 52 at 7.)  The Superintendent denied Plaintiff's request for protective custody, determining Plaintiff had provided no evidence to support allegations asserted in the grievance.  *Id.* at 12.  Plaintiff contends the grievance regarding Officer DeSantis' misconduct placed the Superintendent on notice that Plaintiff was in imminent danger of being assaulted by the guards.  *Id.* at 7.

Plaintiff claims Defendant Brockley was Officer DeSantis' "most dedicated champion," and Brockley had constantly harassed Plaintiff leading up to May 22, 2013.  *Id.*  On May 21, 2013, Plaintiff was walking to the mental health unit to receive his medication.  *Id.* at 8. Brockley confronted Plaintiff at the medication window, alleging Plaintiff had committed a movement violation.  *Id.*  During a "heated exchange" between Plaintiff and Brockley, Brockley grabbed and slapped an apple out of Plaintiff's hand and proceeded to roughly search Plaintiff before escorting him back to his cell.  *Id.*  Plaintiff also described instances in which Brockley would stare at him while Plaintiff was lying in his cell.  (Dkt. No. 71-12 at 6.)

On May 22, 2013, after receiving his medication, Plaintiff returned to C-1 Company.  *Id.* at 8.  As Plaintiff entered the stairwell, he was hit on the back of his head from behind with a

---

[1]     Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

hard object. *Id.* As he fell to the floor, he was brutally beaten by Defendants Brockley, Colvin, Mayo, Goodrich, and Wanniger. *Id.* at 8. Plaintiff was "kicked, stomped, sexually humiliated, and beat[en] with sticks all over [his] body[,] including [his] head and face." *Id.* Plaintiff claims that while he was on the floor, Brockley instructed Colvin and Goodrich to grab, lift, and spread Plaintiff's legs, after which Brockley proceeded to kick him in the groin area. *Id.* at 9. As Plaintiff struggled to break free, Wanniger struck Plaintiff's head and face with her baton, while Mayo "cudgeled [Plaintiff's] knees, shins, and ribs." *Id.* As a result, Plaintiff's face was "grossly swollen." *Id.* at 8. During the assault, Plaintiff was referred to as "Rodney King," and other racial and sexual slurs. *Id.*

Plaintiff was subsequently taken to the facility hospital to have his injuries treated. *Id.* at 9. Nurses Boyce and Clapper examined Plaintiff. *Id.* Plaintiff's injury report indicated Plaintiff had sustained superficial abrasions on his left lower leg, left eye, right eye, and the bridge of his nose. (Dkt. No. 52-1 at 15.) However, Plaintiff asserts that given the "length and breadth" of the assault, Boyce and Clapper had "downplayed the severity of [his] injuries." (Dkt. No. 52 at 8.) Plaintiff also asserts Boyce and Clapper disregarded the more serious injuries by not treating them, and excluding those injuries from the report. *Id.* at 12. Plaintiff claims Clapper had questioned him from afar, and that Boyce had displayed indifference to Plaintiff's injuries. *Id.* In addition, Plaintiff asserts that Defendant Hermance, instead of providing medical treatment to Plaintiff, falsified reports indicating Colvin, Mayo, and Brockley had suffered injuries as a result of the incident. *Id.* at 10.

## II.   APPLICABLE SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact.  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[2]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

---

[2]    The Court finds that Plaintiff's amended complaint was adequately verified by the language "Accordingly, I declare under penalty of perjury that the annexed document is true and correct."  (Dkt. No. 52 at 16.)

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id*. (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93

Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[3] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.   DISCUSSION

### A.   *Heck v. Humphrey*

In support of summary judgment on Plaintiff's excessive force claim, Defendants argue that Plaintiff's success on this claim would imply the invalidity of his underlying disciplinary conviction.  (*See* Dkt. No. 71-1 at 23.)  Thus, Defendants argue, the favorable termination rule applies and, as a result, Plaintiff's retaliation claim is barred.  The Court, however, finds that *Heck v. Humphrey*, 512 U.S. 477 (1994) does not bar Plaintiff's excessive force claim as it does not necessarily imply the invalidity of his prior disciplinary conviction.

In *Heck*, the Supreme Court held that "in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87.

In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended *Heck*'s favorable termination rule to disciplinary adjudications, holding that a prisoner's claim for damages was not cognizable under § 1983 where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his [disciplinary] conviction." *Id.* at 643.  A plaintiff whose

---

[3]      Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

success on his § 1983 claim would necessarily invalidate his confinement or its duration must

seek relief through the federal habeas corpus statute rather than § 1983. *Peralta v. Vasquez*, 467

F.3d 87, 104 (2d Cir. 2006).[4]

To prevail on a claim of excessive force against prison officials under the Eighth

Amendment, the lynchpin inquiry is "whether force was applied in a good-faith effort to

maintain or restore discipline or maliciously and sadistically for the very purpose of causing

harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). "In determining whether the use of force

was wanton and unnecessary," the court should evaluate "the need for application of force, the

relationship between that need and the amount of force used, the threat reasonably perceived by

responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* at 7

(citation and internal quotation marks omitted).

Regarding the application of *Heck* to excessive force claims, the Second Circuit has

explained that the favorable termination rule does not apply to claims where the alleged "use of

excessive force lacks the requisite relationship to the conviction." *Jackson v. Suffolk Cnty.*

*Homicide Bureau*, 135 F.3d 254, 257 (2d Cir. 1998). "For this 'requisite relationship' to exist

and the favorable termination rule to apply, the particulars of the excessive force claim must be

such that the plaintiff's success on said claim *necessarily* implies the invalidity of a prior

disciplinary adjudication. If, on the other hand, the plaintiff's success on the excessive force

claim in question *would not necessarily* invalidate a prior disciplinary conviction, the favorable

---

[4]      In *Peralta*, the Second Circuit found "that the purpose of the *Heck* favorable termination
requirement is to prevent prisoners from using § 1983 to vitiate collaterally a judicial or
administrative decision that affected the overall length of their confinement, and that
punishments related to their term of imprisonment, or the procedures that led to them (if the
procedural defect at issue was critical to the imposition of the punishment), must be attacked
through a habeas petition." *Id.*, 467 F.3d at 104.

termination rule does not apply and the claim is not barred." *Dabney v. Pegano*, 2013 WL 5464776, at *18 (N.D.N.Y. Sept. 30, 2013) (citing *Jackson*, 135 F.3d at 257) (emphasis in original).

Defendants cite a multitude of cases in support of their position that the favorable termination rule applies to Plaintiff's excessive force claims. However, the Court finds these cases unpersuasive. In a recent case, the Second Circuit reviewed a case with facts similar to those of this case. *Shapard v. Attea*, ___ F. App'x. ___ , 2017 WL 4548439, at *1 (2d Cir. Oct. 12, 2017). There, the plaintiff had filed a complaint alleging, among other things, complaints of excessive force arising out of an incident where officers punched, kicked, and beat the plaintiff. *Id.* at *1. The complaint stated that at the hearing regarding the incident, the plaintiff was found to have "initiated the incident by assaulting one of the officers." *Id.* The plaintiff ultimately plead guilty to second degree assault in connection with the incident and admitted that he "set in forth actions that ultimately led to the injury of [the officer]." *Id.* Although attachments to the plaintiff's complaint reflected the plaintiff's previous denials of guilt, the Court found that the complaint did not necessarily adopt the pre-guilty plea denials in the documents. *Id.* at *2.

The Second Circuit determined that the plaintiff's excessive force claim was not barred by *Heck* because the "favorable adjudication would not necessarily imply the invalidity of [the plaintiff's] prior assault conviction." *Id.* (internal quotation marks omitted). The Court reviewed the elements of excessive force and second degree assault, and determined the elements were not incompatible. *Id.* (citations omitted). The Second Circuit also determined that the excessive force claim did not require the invalidity of the plaintiff's assault conviction, considering the plaintiff's prior guilty plea did not prevent him from testifying as to the force used by the defendants and the injuries he sustained. *Id.* at *2-3. Thus, in finding that the plaintiff's

excessive force claim could be reconciled with the assault of the officer, the Second Circuit determined the claim was not barred by *Heck*.  *Id.* at *3.

Here, the Court finds that given the nature of Plaintiff's disciplinary convictions and the allegations underlying his excessive force claim, Plaintiff's Tier III adjudication does not bar his excessive force claims in this case.  Based on the evidence presented at the Tier III hearing, Plaintiff was found guilty of the following disciplinary violations arising from the May 22, 2013, incident: violent conduct, assault on staff, refusing direct orders, and refusing search or frisk. (Dkt. No. 71-5 at 2.)  None of these convictions preclude a finding that the corrections officers also used excessive force against Plaintiff during this incident.  *See Griffin v. Crippen*, 193 F.3d 89, 91-92 (2d Cir. 1999) (appellant's guilty plea on assault charges against corrections officers did not bar Eighth Amendment excessive force claim); *Jeanty v. Cnty. Of Orange*, 379 F. Supp. 2d 533, 543-44 (S.D.N.Y. 2005) (denying summary judgment to defendant police officers where plaintiff pleaded guilty to assaulting police officer, but "a jury could reasonably conclude that . . . after [plaintiff] had been subdued, he was subjected to excessive force by the individual defendants").  Because it is possible for a fact finder to accept the validity of Plaintiff's disciplinary convictions and still conclude that Defendants used excessive force, Plaintiff's excessive force claim does not "necessarily imply the invalidity of his conviction[s]."  *Edwards*, 520 U.S. at 642.  Therefore, the favorable termination rule is inapplicable and *Heck* does not bar Plaintiff's excessive force claim.

> **B.**     **Eighth Amendment Excessive Force Claim**

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . . including the unnecessary and wanton infliction of pain."  *Griffen*, 193 F.3d at 89 (citation and internal quotation marks omitted).  An Eighth Amendment excessive force claim has two

elements – "one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal citation and quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)).

The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

### 1.   Defendants Brockley, Colvin, Mayo, Goodrich, and Wanniger

Plaintiff brings claims of excessive force against Defendants Brockley, Colvin, Mayo, Goodrich, and Wanniger in connection with the May 22, 2013, incident.  Defendants assert they are entitled to summary judgment on these claims as no reasonable jury could believe Plaintiff's

factual account because the record demonstrates it is not credible.  However, the Court finds

there are genuine issues of fact precluding the grant of summary judgment.

Here, Plaintiff's complaint alleges that as he entered the stairwell area, Plaintiff was hit in

the back of his head with a hard object and was then kicked, stomped, sexually humiliated, and

beaten with sticks all over his body.  (Dkt. No. 52 at 9.)  If Plaintiff's version of events is

credited, a reasonable jury could find that Defendants' use of force was more than *de minimis*.

*Compare DeBlasio v. Rock*, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *13

(N.D.N.Y. Sept. 24, 2011) (beating the plaintiff with sticks, fists, and feet more than *de minimis*

despite the plaintiff having only suffered bruises and discomfort as a result of force), *with Aziz

Zarif Shabazz v. Pico*, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) (kicking the plaintiff's ankles and

feet during pat frisk is *de minimis*).

Moreover, the evidence in the summary judgment record consists of conflicting versions

of the facts regarding the alleged use of excessive force.  Plaintiff alleges that as he walked into

the staircase, he was hit in the back of the head with a hard object and then severely beaten.

(Dkt. No. 52 at 8; Dkt. No 71-12 at 6.)  In contrast, Defendants describe their use of force as that

necessary to place restraints on a combative inmate who had punched Brockley upon being asked

to submit to a pat and frisk.  (Dkt. No. 71-4 at 2; Dkt. No. 71-5 at 10.)

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 255 (1986).  The Court acknowledges an exception to this rule exists where

"plaintiff relies almost exclusively on his own testimony, much of which is contradictory and

incomplete . . . ."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  In such a "rare

circumstance," it would ". . . be impossible for a district court to determine whether 'the jury

could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of fact, without making some assessment of the plaintiff's account." *Id.* (citation omitted).

Although Plaintiff is relying exclusively on his own testimony in this case, his testimony is not "contradictory and incomplete." Plaintiff's deposition testimony generally tracks what he alleged in his amended complaint. *See DeBlasio*, 2011 WL 4478515, at *13 (the plaintiff's testimony is not "contradictory and incomplete" where plaintiff had alleged in his complaint that the defendants had beat him with sticks, fists, and feet, and had testified at his deposition that the defendants had hit him only with fists). Therefore, the *Jeffreys* exception does not apply. Thus, the Court finds Plaintiff has raised a triable issue of fact as to Defendants' use of excessive force against him, and recommends denying summary judgment on Plaintiff's Eighth Amendment excessive force claims to Brockley, Colvin, Mayo, Goodrich, and Wanniger.

### 2. Defendant Racette

Plaintiff has asserted a supervisory liability claim against Defendant Racette on the theory that he failed to place Plaintiff in protective custody upon the filing of his formal grievance against DeSantis, and on the theory that Racette had failed to take action despite knowledge of instances of assaults on inmates by corrections officers occurring in the stairwell, and other unsurveilled locations. (Dkt. No. 13-14.) As discussed below, the Court finds no evidence on which a jury could reasonably find for Plaintiff as to his claims of supervisory liability and, thus, recommends granting Racette summary judgment on Plaintiff's excessive force claim.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each government-official defendant, through the official's own

individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)

("Government officials may not be held liable for the unconstitutional conduct of their

subordinates under a theory of *respondeat superior*.").  "Holding a position in a hierarchical

chain of command, without more, is insufficient to support a showing of personal involvement."

*Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28,

2012) (citing *McKinnon*, 568 F.2d at 934).  Therefore, "a plaintiff must . . .  allege a tangible

connection between the acts of a defendant and the injuries suffered."  *Bass v. Jackson*, 790 F.2d

260, 263 (2d Cir. 1986).

     The Second Circuit has held that personal involvement by a supervisor necessary to state

a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged

constitutional violation, (2) the defendant, after being informed of the violation through a report

or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4)

the defendant was grossly negligent in supervising subordinates who committed the wrongful

acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to

act on information indicating that unconstitutional acts were occurring."  *Colon v. Coughlin*, 58

F.3d 865, 873 (2d Cir. 1995)[5].

     "Where a supervisory official receives and acts on a prisoner's grievance . . . personal

involvement will be found under the second *Colon* prong."  *Dallio v. Hebert*, 678 F. Supp. 2d 35,

62 (N.D.N.Y. 2009) (internal citations and punctuation omitted).  The grievance must have some

---

[5]     The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated
any of the *Colon* bases for liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d
Cir. 2013).

connection with the final incident, such that inaction or action in response to the grievance could constitute the requisite personal involvement. *See id.* at 63.  As to Plaintiff's theory of supervisory liability based on Racette's failure to remedy the violation after being informed of it through Plaintiff's grievance, the Court concludes there is no evidence on which a jury could reasonably find for Plaintiff.  In the grievance at issue, Plaintiff provided the following description of the problem:

> Officer C. DeSantis threatens me often and promised to have officers do physical harm to me. Whenever DeSantis and I are in the presence of other officers she plays the role of an angry victim and stages a tantrum in an attempt to inflame the other officers and cause a violent incident. I've noted 9 officers whom she gossiped to about me, one of which is willing to attest that her feelings for me resembles that of a woman scorned and professional detachment is now an issue for her.

(Dkt. No. 72-1 at 11.)  Plaintiff also requested protective custody, stating "[Officer DeSantis'] episodes are timed and designed to put me in harm's way.  I fear for my safety . . . ." *Id.*  When appealing the rejection of his request, Plaintiff stated "[a]n appeal is necessary because Officer DeSantis is too emotionally invested in me and will not be able to rid her mind of thoughts of me without professional help.  Please bring my complaint to her attention and get her help." *Id.* at 12.

The grievance and the subsequent notice of appeal did not put Racette on notice of a pending assault by officers.  Instead, the entirety of the contents demonstrated Plaintiff's grievance with the actions of Officer DeSantis.  Specifically, Plaintiff was concerned with Officer DeSantis staging a scene in order to incite a reaction out of other officers.  Thus, the grievance would have placed Defendant on notice, at most, of potential conflict erupting as a result of Officer DeSantis' instigation, or at the very least, Officer DeSantis' presence.

However, the record indicates Officer DeSantis was not present at the incident at the medication window that occurred the day before the May 22, 2013, incident, nor was she present

on the day of the May 22nd incident.  It appears there is no connection between the contents of

Plaintiff's grievance, and the May 22nd incident.  Thus, the Court finds no evidence through

which a jury could reasonably conclude Racette's receipt and denial of Plaintiff's grievance

constituted Racette's knowledge of a constitutional violation or a failure to remedy the violation

for purposes of finding supervisory liability.

Moreover, the Court also finds Plaintiff's request to provide an officer-witness in support

of his grievance, and Racette's decision not to interview the officer-witness, does not place

Racette on notice of a pending assault by officers.  In his grievance, Plaintiff offered the officer-

witness specifically "to attest that [Officer DeSantis'] feelings for [Plaintiff] resemble[d] that of

a woman scorned and professional detachment is now an issue for [Officer DeSantis]."  There is

no evidence indicating Plaintiff's basis for providing an officer-witness was to speak of a threat

related to the likelihood of the use of excessive force by officers against Plaintiff.  Thus, the

Court finds no evidence in which a jury could reasonably conclude Racette's decision to not

interview the officer-witness constituted knowledge on his part of a constitutional violation or

failure to remedy such a violation.

Second, Plaintiff asserts supervisory liability under the third *Colon* factor, arguing

Racette had created, or had permitted to continue, a policy or custom under which incidences of

excessive force by officers occurred in the unsurveilled stairway area, allowing for the May 22nd

incident involving Plaintiff.  However, the Court finds there is no evidence on which a jury could

reasonably find for Plaintiff.

At his deposition, Plaintiff indicated it was rumored that officers did their "dirty work"

assaulting inmates in the stairwells due to the absence of cameras.  (Dkt. No. 71-12 at 18.)  When

asked at his deposition regarding examples of similar incidents prior to the May 22, 2013,

16

incident, Plaintiff answered: "Prior to mine it was just a general rumor but then after my incident that's when I gathered something concrete that happened in the staircase."  (Dkt. No. 71-12 at 18.)  In making reasonable inferences in favor of Plaintiff, Plaintiff has indicated one similar incident that occurred either prior to or around the same time as Plaintiff's May 22nd incident. *Id.* at 18-19.  However, Plaintiff does not know the name of the inmate, nor has he provided other details relating to this incident.  *Id.* at 19.  Moreover, Plaintiff denied knowledge of Racette being aware of the rumors regarding incidents occurring in the stairwell prior to the May 22nd incident.  *Id.* at 19.  In support of his contention, Plaintiff provided a list of specific grievances detailing similar use-of-force incidents that occurred in a sixty day period, after the May 22nd incident.  (Dkt. No. 79 at 6.)

Plaintiff has admitted to having no knowledge whether Racette was aware of such incidents, and has failed to provide any evidence demonstrating a triable issue of fact regarding Racette's knowledge and his alleged creation of unconstitutional practices or his allowing of them to continue.  Beyond conclusory allegations or assertions of "general rumors," Plaintiff has not provided evidence of similar events occurring prior to the May 22, 2013, incident.  Instead, Plaintiff provided a list of incidents that occurred in a sixty day period, *after* the May 22nd incident.  Such evidence sheds no light on Racette's actions or conduct in creating or permitting a policy or custom of excessive force in unsurveilled areas, which resulted in the May 22nd incident.  Because the record is devoid of evidence indicating the personal involvement of Racette in creating or permitting the complained of policy or custom, the Court finds no evidence on which a jury could reasonably find for Plaintiff as to his claims of supervisory liability.  Thus, the Court recommends granting Racette summary judgment on Plaintiff's excessive force claim.

### C.    Exhaustion of Administrative Remedies

Defendants seek summary judgment on Plaintiff's deliberate indifference to medical needs claim on the grounds that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Program ("IGP") by failing to describe Defendants' improper treatment of him.  (Dkt. No. 71-1 at 11.)  However, as discussed below, the Court finds that Plaintiff has sufficiently exhausted his administrative remedies with regard to the claims against Defendants Clapper, Boyce, and Hermance.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted).  In New York State prisons, DOCCS has a well-established three-step IGP.  N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

Neither the PLRA nor the DOCCS IGP impose a requirement that an individual later named as a defendant be identified in the grievance in order to exhaust administrative remedies. *See Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009) (citing *Jones*, 549 U.S. at 205, 217). Though an inmate is not required to name the responsible parties in his grievance, he must "provide a specific description of the problem." *Id*. at 127; *see also id.* at § 701.5(a)(2) (grievance should "contain a concise, specific description of the problem."). The exhaustion requirement "is not dissimilar to the rules of notice pleading," and "in order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson*, 380 F.3d at 697.

The court finds there is sufficient evidence in the record demonstrating Plaintiff has exhausted his medical indifference claim. The subject of Plaintiff's grievance included "inadequate medical care." (Dkt. No. 52-1 at 3.) Regarding this claim, Plaintiff detailed:

> After being brutally beaten I was taken to the facility hospital supposedly to have my injuries treated. Once there, however, nurses H. Clapper, T. Hermance, and nurse Boice [sic] conspired with security staff to downplay the severity of my injuries by denominating them as "superficial." Also, these nurses fabricated and falsified documents/medical reports to indicate that correction officers involved in the incident were injured when, in fact, they were not.

*Id.*

In *Espinal*, the plaintiff was allegedly assaulted by officers, and when taken to the clinic, the plaintiff requested another doctor because the doctor administering the exam was causing the plaintiff pain. 558 F.3d at 122. The plaintiff's request was denied and, as a result, the plaintiff filed two grievances. *Id.* 122-23. The first grievance described an excessive force incident, and did not include any reference to a medical indifference claim. *Id.* at 122. The Second Circuit determined the first grievance, despite no mention of misconduct by medical personnel, provided sufficient notice of the deliberate

indifference claim because the DOCCS personnel had considered such allegations while reviewing the plaintiff's grievance.  *Id.* at 128.  In the second grievance, the plaintiff asserted a deliberate indifference to medical needs claim, noting he had been denied access to medical care.  *Id.* at 122.  The Second Circuit determined the second grievance also provided sufficient notice to the defendant.  *Id.* at 128.  In response to the grievance, DOCCS personnel investigated the plaintiff's claim.  *Id.*  The court found the investigator's subsequent report determining that the plaintiff had sufficient access to medical treatment as evidence the plaintiff's "grievance enabled the State to investigate [the plaintiff's] claim that he was denied access to medical care."  *Id.*

In reviewing *Espinal*, the Court finds a similar outcome is warranted in this case considering the grievance here included more information than was included in the first grievance in *Espinal*: the grievance's subject line included "inadequate medical care," and the content detailed misconduct by medical personnel.  Thus, on its face, the grievance at issue was sufficient to allow an investigation into Plaintiff's claim of inadequate medical care.

In addition, although the misconduct alleged in the grievance does not perfectly mirror the misconduct now asserted by Plaintiff, all that is required of a grievance is a sufficient description that would provide sufficient notice of wrongdoing to permit the investigation of such a claim.  Plaintiff's grievance did just that, as evidenced by the Deputy Superintendent for Administration's report.  (*See* Dkt. No. 71-8 at 2.)  In response to Plaintiff's grievance, the report indicates the Deputy Superintendent investigated claims of inadequate medical care and failure to properly document injuries.  *Id.*  The Deputy Superintendent interviewed Defendant Clapper and Plaintiff, and reviewed

Clapper's written statement.  *Id.*  Upon concluding his investigation, the Deputy Superintendent determined there was insufficient evidence to substantiate Plaintiff's allegations of misconduct by Defendants.  *Id.*  Thus, like the investigator's report in *Espinal*, the Deputy Superintendent's report investigating plaintiff's claim of deliberate indifference shows that Plaintiff's grievance had provided Defendants sufficient information to investigate Plaintiff's deliberate indifference to medical needs claims. Therefore, the Court finds Plaintiff has sufficiently exhausted his administrative remedies with regard to the claims against Defendants Clapper, Boyce, and Hermance.

**D.      Deliberate Indifference to Medical Needs**

Defendants seek summary judgment on Plaintiff's deliberate indifference to medical needs claim on the grounds that Plaintiff's injuries did not rise to a level of "sufficiently serious." The Court agrees and, thus, as discussed below, recommends granting Defendants Clapper, Boyce, and Hermance summary on Plaintiff's deliberate indifference claims.

"To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  The deliberate indifference standard is comprised of an objective and a subjective component.

"Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  In evaluating whether a medical condition was sufficiently serious, relevant factors include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly

affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal citation and punctuation omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind." *Id*. The subjective element of deliberate indifference "entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *see also Estelle*, 429 U.S. at 106 ("A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

"An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837.)  More than medical malpractice is required to establish a constitutional violation. *Hill v. Curcione*, 657 F.3d 116 (2d Cir. 2011).  "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness. . . ." *Id.* at 123.

### 1.  Nurse Clapper and Nurse Boyce

Defendants characterized Plaintiff's injuries as those that "fall well below the level of seriousness required in a deliberate indifference claim." (Dkt. No. 71-1 at 14.)  The Court agrees.  In his amended complaint, Plaintiff alleges the following injuries: swelling and abrasions above left eye; bruising and swelling on left side of face; swelling above right eye; swelling on

upper right forehead; swelling near center of back; laceration on left shin; left shin bone injury; right knee injury; left pinky base injury; and left rib injury.  (Dkt. No. 52 at 11.)

The Court finds there is no evidence on which a jury could reasonably conclude the injuries presented to Clapper and Boyce at the time of Plaintiff's examination following the May 22nd incident were "sufficiently serious."  *See, e.g., Ford v. Phillips*, No. 05 Civ. 6646 (NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar. 27, 2007) ("Abrasions, a minor bruise, slight bleeding and scratches are not injuries that produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary.").

Significantly, Plaintiff himself admitted that the majority of the swelling and abrasions had resolved within a week, with the exception of his shin and hand.  (Dkt. No. 71-12 at 14.) Plaintiff went on further to deny that he had been diagnosed with an injury regarding the hand, and noted that the swelling had resolved on its own.  *Id.*  With regard to the infection that stemmed from the injury he sustained from the May 22, 2013, incident, Plaintiff indicated that upon discovering the seeping wound, he had requested an emergency sick call and was then taken to the hospital for treatment.  *Id.*  Once taken to the hospital, the doctor treated the infection and placed Plaintiff on a 30 day regimen.  *Id.*  The resulting infection was related to the underlying shin injury that resulted from the May 22nd incident; however, even if the infection was determined sufficiently serious, the resulting injury could not be a basis in which to attribute liability to Clapper and Boyce considering they were presented with, and diagnosed as superficial abrasions on Plaintiff's shin with no signs of infection.

Plaintiff has not provided evidence that the injuries from the May 22, 2013, incident required further treatment.  Plaintiff has not alleged, nor provided evidence that the complained of injuries had significantly interfered with his daily activities, or that they have caused him

substantial or chronic pain.  Thus, because there is no evidence in which a jury could reasonably conclude Plaintiff's medical condition was "sufficiently serious," the Court recommends granting Clapper and Boyce summary judgment Plaintiff's deliberate indifference claims.

### 2.  Nurse Hermance

The Court finds likewise summary judgment proper as to Plaintiff's deliberate indifference claim against Nurse Hermance, as there is no evidence in which a jury could reasonably conclude any basis for attributing liability to her.   In his complaint, Plaintiff noted that Hermance, instead of treating plaintiff, "utilized her time falsifying business records to indicate that three officers were injured."  (Dkt. No. 52 at 12.)  At his deposition, Plaintiff confirmed that Hermance was not involved in his examination, and that the communication he did have with Hermance regarding the May 22, 2013, incident occurred a couple of months after the incident.  (Dkt. No. 71-12 at 15.)  Moreover, in his response to Defendants' motion for summary judgment, Plaintiff further elaborated on his claim against Hermance, again alleging she had falsified records indicating Brockley had been injured as a result of the May 22nd incident.  (Dkt. No. 79 at 16.)

As discussed above, summary judgment as to Nurse Hermance would be proper considering Plaintiff's medical condition was not "sufficiently serious."  However, even if the condition was "sufficiently serious," there is no evidence in which a jury could reasonably find that Hermance was deliberately indifferent to Plaintiff's needs.  In reviewing the evidence provided, including Plaintiff's own admission, Hermance was not personally involved in the examination of Plaintiff.  Instead, the record indicates that Hermance was involved in the medical evaluation of personnel involved in the subject incident.  (*See* Dkt. No. 71-5 at 11.) Thus, allegations of Hermance falsifying records of other officers, even if true, would not

constitute deliberate indifference to Plaintiff's medical needs, considering Boyce and Clapper, not Hermance, examined Plaintiff.  Thus, the Court recommends granting Defendants' motion for summary judgment as to Plaintiff's claim of medical difference against Hermance.

## IV.    CONCLUSION

Based on the above findings, the Court recommends that Defendants Brockley, Colvin, Mayo, Goodrich, and Wanniger's motion for summary judgment on Plaintiff's Eighth Amendment excessive force claims be denied.  (Dkt. No. 71)  The Court further recommends that summary judgment be granted to Defendants Racette, Clapper, Boyce, and Hermance.

**WHEREFORE,** it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 71) be **DENIED IN PART** and **GRANTED IN PART**; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendants Racette, Clapper, Boyce, and Hermance; and it is further

**RECOMMENDED** that summary judgment be **DENIED** to Defendants Brockley, Colvin, Mayo, Goodrich, and Wanniger; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the

---

[6]    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs*., 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: February 16, 2018
      Syracuse, New York

                                       Therèse Wiley Dancks
                                       United States Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

**Opinion**

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

Cole v. Artuz, Not Reported in F.Supp.2d (1999)

1999 WL 983876

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

## B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1] In light of this finding, there is no need to consider the defendant's qualified immunity argument.

## *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

1999 WL 983876

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5464776
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Bartram Yihni DABNEY, Plaintiff,
v.
J. PEGANO, Mess Hall Worker, Great Meadow
C.F.; Livermore, Sergeant, Great Meadow C.F.; W.
Drum, Corr. Officer, Great Meadow C.F.; S. Hamel,
Corr. Officer, Great Meadow C.F.; and R. Lamb,
Corr. Officer, Great Meadow C.F., Defendants.

No. 9:10–CV–1109 (GTS/TWD).
|
Sept. 30, 2013.

**Attorneys and Law Firms**

Bartram Yihni Dabney, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Charles J. Quackenbush, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

**Opinion**

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se*
prisoner civil rights action filed by Bartram Yihni
Dabney ("Plaintiff") against the five above-captioned
New York State correctional employees ("Defendants"),
are (1) Defendants' motion for summary judgment,
(2) United States Magistrate Judge Thérèse Wiley
Dancks' Report–Recommendation recommending that
Defendants' motion be granted, and (3) Plaintiff's
Objection to the Report–Recommendation. (Dkt.Nos.30,
43, 46.) After carefully reviewing the relevant filings in
this action, the Court can find no error in the thorough
Report–Recommendation, clear or otherwise: Magistrate
Judge Dancks employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. As a result, the Court accepts and adopts the
Report–Recommendation for the reasons stated therein.
(Dkt. No. 43.)

The Court would add only two brief points. First, in
his response to Defendants' motion, Plaintiff failed to
deny (with supporting record citations) the properly
supported facts asserted in Paragraphs 3 through 5
of Defendants' Statement of Material Facts (regarding
exhaustion of administrative remedies). (*Compare* Dkt.
No. 30, Attach. 2 *with* Dkt. No. 34.) Defendants' motion
papers provided Plaintiff with detailed and explicit notice
of the consequences of failing to submit a proper response
to Defendants' Statement of Material Facts. (Dkt. No. 30,
at 3.) [1] In addition, before he responded to Defendants'
motion for summary judgment in this action on December
13, 2012, Plaintiff had responded to motions for summary
judgments in seven other prisoner civil rights actions
in federal court. [2] For all of these reasons, the Court
finds that Plaintiff's failure was "willful" for purposes of
Fed.R.Civ.P. 83(a)(2). As a result, Plaintiff has admitted
the facts asserted in those paragraphs, under Local Rule
7.1(a)(3) of the Local Rules of Practice for this Court.

[1] The Court notes that the notice provided in this
case was more detailed and explicit than the notice
provided in the case of *Jamison v. Metz,* No. 11–
4242, 2013 WL 4838829 (2d Cir. Sept.12, 2013).
*See Jamison v. Metz,* 09–CV–0620, Notification of
Consequences of Failing to Respond to Summary
Judgment Motion (N.D.N .Y. filed June 9, 2010).

[2] *See Dabney v. Stormer,* 10–CV–0519, Plf.'s Response
to Defs.' Motion for Summary Judgment (N.D.N.Y.
filed Nov. 19, 2012); *Dabney v. Goord,* 04–CR–
0988, Plf.'s Response to Defs.' Motion for Summary
Judgment (S.D.N.Y. filed Jan. 8, 2007); *Dabney v.
Goord,* 04–CV–0944, Plf.'s Response to Defs.' Motion
for Summary Judgment (N.D.N.Y. filed Dec. 22,
2006); *Dabney v. Eagen,* 03–CV–0184, Plf.'s Response
to Defs.' Motion for Summary Judgment (N .D.N.Y.
filed Aug. 17, 2005); *Dabney v. McGinnis,* 97–CV–
0489, Plf .'s Responses to Defs.' Motion for Summary
Judgment (S.D.N.Y. filed Sept. 3, 2004); *Dabney
v. McGinnis,* 01–CV–0065, Plf.'s Response to Defs.'
Motion for Summary Judgment (S.D.N.Y. filed
May 21, 2003); *Dabney v. Ricks,* 94–CV–1058, Plf.'s
Response to Defs.' Motion for Summary Judgment
(N.D.N.Y. filed Feb. 2, 2000).

Second, in his Objections, Plaintiff never specifically
challenges Magistrate Judge Dancks' alternative holding
that Plaintiff's retaliation claim against Defendant Pegano
should be dismissed based on *Heck v. Humphrey,* 512 U.S.

477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (*Compare* Dkt. No. 43, at 38–39 *with* Dkt. No. 46.) As a result, that recommendation is subject to only a clear-error review, which it survives. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. [3] **ACCORDINGLY,** it is

[3]     When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 43) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 30) is *GRANTED* in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

*REPORT–RECOMMENDATION and ORDER*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Bartram Yihni Dabney, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges constitutional violations arising from a May 21, 2010, incident at Great Meadow Correctional Facility ("Great Meadow"). Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) For the reasons discussed below, I recommend that Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

**\*2** The claims in this action arise from an altercation between Plaintiff and Defendant Correction Officers Hamel, Drum, and Lamb at Great Meadow. The record indicates that on May 21, 2010, as Plaintiff and other members of his housing unit were walking to the facility mess hall for the noon meal, Defendants Hamel, Drum, and Lamb pulled Plaintiff from the line of other inmates for a search. (Dkt. No. 1 at 7; 30–10 at 6.) After separating Plaintiff from the other prisoners, the corrections officers ordered Plaintiff to place his hands on the wall in preparation for a search. (Dkt. No. 1 at 7 .) Plaintiff complied with the order, and with Plaintiff's hands positioned on the wall, Defendant Hamel began a "pat-frisk" search of Plaintiff's clothes and person. (Dkt. No. 1 at 7; 30–10 at 6.)

At this point in the narrative, the parties' accounts diverge, placing the facts that follow in dispute.

*Plaintiff's Allegations*

Plaintiff alleges that after removing him from the line of other inmates, Defendants Drum, Hamel, and Lamb took him to a "blind area, away from all eyes" for the search. (Dkt. No. 1 at 7.) Once Plaintiff had his hands positioned on the wall as Defendants had instructed, Plaintiff claims that Defendant Hamel approached him from behind, picked him up, and slammed him to the floor. *Id.* Plaintiff states that he lost consciousness as a result of the impact. *Id.* Plaintiff states that when he regained consciousness sometime later, he was lying on the floor handcuffed, with the correction officers assaulting him. (Dkt. No. 1 at 7.) As for the specifics of the assault, Plaintiff states that he remembers Defendant Drum kicking him in the face and Defendant Hamel stomping his back. *Id.* He alleges that at one point, he was slammed face-first into the floor and that while Defendants Drum and Hamel restrained him, Defendant Drum whispered "that that [*i.e.,* the assault] was for writing him or them up." (Dkt. No. 1 at 8.) At some point later during the assault, Plaintiff claims that he heard Defendant Sergenant Livermore ask Defendants Drum, Hamel, and Lamb whether Plaintiff was still breathing and when they answered that he was, Sgt. Livermore cautioned "not too hard." *Id.* At another point during the beating, Plaintiff states that he heard

2013 WL 5464776

Defendant Lamb ask Defendant Livermore whether "this [was] good enough," and that in response, Sgt. Livermore stated, "yeah." *Id.* As for the meaning of this exchange, Plaintiff states that he later learned that Defendants Lamb and Livermore "were referring to the weapon they were going to use to justify this felonious criminal assault." *Id.*

### Defendants' Version

In their motion, Defendants refute Plaintiff's claim that Defendants Drum, Lamb, and Hamel assaulted him. Rather, Defendants contend that Plaintiff was singled out for a search because Defendant Drum noticed bulges in Plaintiff's pockets while Plaintiff was walking with other inmates to the noon meal. (Dkt. No. 30–10 at 6, 9.) Removing him from the line of other inmates, Defendants contend that Defendant Hamel conducted a pat-frisk search of Plaintiff's clothing. *Id.* While frisking Plaintiff's pants, Defendants allege that Defendant Hamel discovered a sharpened piece of metal in Plaintiff's pocket. *Id.* Defendants state that Hamel then called out to the other correction officers for assistance. (Dkt. No. 30–10 at 6, 8, 9.) Before the other correction officers could assist, Defendants claim that Plaintiff came off the wall and struck Hamel in the head with his elbow. (Dkt. No. 30– 10 at 6, 9.) To restrain him, Defendants allege that Hamel placed Plaintiff in a body hold and forced him to the floor. *Id.* On the way down to the floor, Defendants claim that Plaintiff hit his head on a wall-mounted fire extinguisher. *Id.* at 6. Once Plaintiff was down, Defendants state that Defendants Drum and Lamb arrived to assist Hamel wrestle Plaintiff to the floor and place him in handcuffs. (Dkt. No. 30–10 at 6, 8, 9.)

### Plaintiff's Medical Exam and Injuries

**\*3** Immediately following the incident, Defendants Lamb, Hamel, and Drum escorted Plaintiff to the prison medical unit where he was examined by a nurse. (Dkt. No. 1 at 8; 30–10 at 1–4.) An officer with a video camera recorded Plaintiff's escort to the Great Meadow infirmary. (Dkt. No. 33.) Plaintiff claims that he told the nurse that the correction officers had "knocked out half of my tooth" during the assault, but rather than examining him, the nurse left the room. *Id.* While in the medical unit, DOCCS personnel then took a photograph of Plaintiff to document his injuries. (Dkt. No. 30–11 at 1–17.) The

photographs show bruising and redness on the right side of his face and a small cut on his nose. *Id.* at 1. Following the medical examination, Plaintiff was escorted to a cell in the Special Housing Unit. (Dkt. No. 1 at 8.)

In the days following the assault, Plaintiff alleges that he experienced pain and swelling in his limbs and muscles, as well as sharp pain in his ribs, and that he was unable to eat as a result. (Dkt. No. 1 at 8.) Plaintiff alleges that he also experienced pain in his head following the assault and observed blood coming out of his ear. *Id.* Plaintiff states that on May 24, 2010, he informed the on-call nurse of his symptoms and the nurse told him that he would be called to see the doctor. *Id.* Plaintiff told the nurse that he was unable to walk due to his injuries and would need a wheelchair to get to the doctor. *Id.* DOCCS denied this request. *Id.*

### Plaintiff's Disciplinary Charges and Tier III Hearing

As a result of the May 21, 2010, incident, Defendant Hamel issued Plaintiff a misbehavior report charging Plaintiff with assault on staff and a number of other disciplinary violations. (Dkt. No. 31–9 at 11.) A Tier III hearing on the disciplinary charges was scheduled for May 25, 2010. (Dkt. No. 31–10 at 1–3; 30–8 at 2–3.) Defendant James Pegano, the Food Services Administrator at Great Meadow, was the hearing officer assigned to preside over the disciplinary proceedings. (Dkt. No. 31–10 at 1.)

On the morning of the hearing, the correction officer assigned to escort Plaintiff to the hearing went to Plaintiff's cell to retrieve him. (Dkt. No. 1 at 9; 30–8 at 2.) When the officer arrived, however, Plaintiff informed him that he was unable to walk due to his leg injuries and thus could not accompany him to the proceeding. *Id.* Plaintiff told the officer that he required the assistance of a wheelchair, without which he could not attend the hearing. *Id.*

The transcript of the hearing, held May 25, 2010, at 9:51 a.m., indicates that the officer then went to the location of the hearing and informed Defendant Pegano of Plaintiff's claim that he was unable to walk to the proceeding and that he had requested a wheelchair be provided for his transport. (Dkt. No. 30–8 at 2.) While on the record, Pegano called the facility medical unit to ascertain whether Plaintiff had any injury or condition in his medical file

that would cause a mobility impairment rendering him unable to walk to the hearing as he had claimed. *Id.* Speaking onto the record via telephone, a nurse identified as "Sarah Nichols, RN," stated that she was unable to find anything in Plaintiff's medical records "regarding any difficulty with leg movement or any permanent leg pain or anything of that nature." *Id.* Based on this information, Defendant Pegano concluded that Plaintiff did not have a medical condition that prevented him from attending the disciplinary hearing without transportation assistance. *Id.*

**\*4** Finding that no justification existed for Plaintiff's absence, Pegano proceeded with the adjudication and entered a plea of not guilty on Plaintiff's behalf. (Dkt. No. 30–8 at 3.) At the conclusion of the evidence, Pegano found Plaintiff guilty on all charges and entered convictions for the following disciplinary violations: violent conduct, assault on staff, weapons possession, refusing a direct order, and refusing a search and frisk. (Dkt. No. 30–8 at 3; 31–10 at 1–3.) As punishment for these violations, Pegano sentenced Plaintiff to twelve months confinement in the Special Housing Unit, loss of package, commissary, and phone privileges, and a loss of twelve months of good time credit. (Dkt. No. 30–8 at 3; 31–10 at 1.) Plaintiff's sentence was affirmed on appeal.

### Procedural History

Plaintiff commenced the present civil rights action by filing a complaint on September 16, 2010, alleging multiple constitutional violations arising from the May 21, 2010, incident and the resulting disciplinary convictions. (Dkt. No. 1.) On July 20, 2011, following initial review of Plaintiff's complaint, the Court issued a decision and order dismissing seven of Plaintiff's ten claims. (Dkt. No. 7 at 28.) Subject to consideration in the present case are Plaintiff's three surviving claims: (1) an excessive force claim against Defendants Hamel, Drum, and Lamb; (2) a failure to intervene claim against Defendant Livermore; and (3) a retaliation claim against Defendant Pegano.

Presently before the Court is Defendants' motion for summary judgment. (Dkt. No. 30.) Plaintiff has opposed this motion. (Dkt. No. 34, 35, 38.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under *Federal Rule of Civil Procedure 56*, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a).* The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006).* Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc. ., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir.2008).*

[1]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson, 477 U.S. at 248.*

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*5** To the extent that a defendant's motion for summary judgment under *Federal Rule of Civil Procedure 56* is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6).* As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique, 405 F.2d 270, 273 (2d Cir.1968); accord, Katz v. Molic, 128 F.R.D. 35, 37–38 (S.D.N.Y.1989)* ("This Court finds that ... a conversion [of a *Rule 56* summary judgment motion to a *Rule 12(b)(6)* motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing

Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### III. ANALYSIS

#### A. Failure to Exhaust

Defendants assert that summary judgment should be granted as to all of Plaintiff's claims because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996). Dismissal is appropriate, according to Defendants, because Plaintiff's failure to include his claims in a proper grievance and

to pursue that grievance to completion through the established Inmate Grievance Program procedure bars him from pursuing these claims in the present federal action. (Dkt. No. 30–1 at 6.)

**\*6** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ago*, 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532 (citation omitted). Concerning the nature of this limitation, the Supreme Court has held that the failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citations omitted). In the event that such a defendant establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, the inmate's complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1, 2006 U.S. Dist. LEXIS 65221, at *3 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.) [2] ; *see also Woodford,* 548 U.S. at 94–95 (holding that the PLRA requires "proper exhaustion" of available remedies).

[2]   The Court will provide Plaintiff with a copy of all unpublished decisions cited in this Report–Recommendation and Order in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

The Supreme Court has explained that "[p]roper exhaustion" under the PLRA requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (citing *Woodford,* 548 U.S. at 95). Procedural compliance is mandatory despite the fact that placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense"; an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her

available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson,* 380 F.3d at 697–98).

In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step grievance program for inmate complaints. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2013). Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

 **\*7** Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3)(ii).

Inmates may seek an extension of the time limits for any of the steps in writing at any of the steps, but such a request must be made within forty-five days of the incident being grieved or the decision being appealed. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g) (2013). Moreover, if an inmate believes that an extension was wrongly denied, he may file a separate grievance protesting the denial. *Id.*

Generally, if a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies and his claims are subject to dismissal. *Woodford,* 548 U.S. at 93. However, a plaintiff's failure to exhaust does not end the inquiry. In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit articulated a three-part inquiry for courts to apply when a defendant contends that a prisoner has failed to exhaust available administrative remedies. *Id.* at 86.[3] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available to the plaintiff and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

3       The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

### 1. *Plaintiff's evidence of exhaustion*

Applying the exhaustion analysis here, I find as an initial matter that Plaintiff failed to exhaust the available administrative remedies as required by the PLRA because he failed to pursue the grievance process to completion for any of his claims in the present action. As proof of Plaintiff's failure to exhaust, Defendants submit the declaration of Jeffrey Hale, the Assistant Director of the Inmate Grievance Program, whose duties include "management of inmate grievance appeal records generated and kept by DOCCS Central Office Review Committee (CORC)." (Dkt. No. 30–3 at 1, ¶ 1.) In his declaration, Hale states that CORC records indicate that as of March 27, 2012, Plaintiff has pursued a total of

eighty-three grievance appeals to CORC. *Id.* at ¶ 4. Of these eighty-three appeals, Hale states that twenty-three originated at the Great Meadow Correctional Facility. *Id.* Concerning CORC's record of appeals relevant to the May 21, 2010, incident subject to the present action, Hale states that Plaintiff filed only one grievance appeal from Great Meadow during 2010 and that said appeal was filed in February 2010 and concerned an unrelated grievance. *Id.* Hale states that Plaintiff never presented an appeal to CORC concerning a 2010 use of force or failure to protect by Great Meadow security staff or an appeal involving 2010 retaliatory actions by Defendant Pagano. *Id.* at 2, ¶ 5–6. As an exhibit to Hale's declaration, Defendants submit a print out of the record of grievance appeals that Plaintiff has submitted to CORC. (Dkt. No. 30–3, 3–7; 30–4, 1–3.) The print out does not include any record of a grievance appeal filed by Plaintiff concerning his claims in the present action. *Id.*

 **\*8** As proof that he did in fact properly exhaust his claims in this action, Plaintiff cites the court to two grievances he filed regarding the claims in this action, as well as letters and other informal complaints seeking resolution of these issues. As discussed below, however, Plaintiff's alleged proof of exhaustion established only that he initiated grievances and other administrative complaints about the claims in this action, not that he pursued them to completion as is required by the PLRA to properly exhaust administrative remedies. *Woodford,* 548 U.S. at 93.

As evidence of his attempts to pursue administrative remedies before filing the present civil action, Plaintiff asserts that he did indeed file IGRC grievances concerning his claims on two separate occasions and that under the circumstances these grievances were sufficient to exhaust his available administrative remedies. First, Plaintiff claims that he filed a grievance about the May 21, 2010, incident with the Great Meadow IGRC within twenty-one days after the incident occurred as required by DOCCS IGP. (Dkt. No. 1 at 4.) He contends that his attempt to pursue this "original grievance" was thwarted, however, when Great Meadow administration threw away his grievance to prevent proper filing. *Id.* [4] (Dkt. No. 34 at 4, ¶ 2.) The second grievance referenced by Plaintiff was one filed with the Clinton Correctional Facility ("Clinton") IGRC on August 6, 2010, following Plaintiff's transfer from Great Meadow to Clinton. (Dkt. No. 34 at 21–24.) In this second grievance, Plaintiff requested that the Clinton

IGRC ascertain why the Great Meadow IGRC had failed to issue a decision on Plaintiff's "original" grievance. *Id.*

[4]     In his complaint, sworn under penalty of perjury, Plaintiff states that he filed a grievance concerning the May 21, 2010, incident with the Inmate Grievance Program, but that the final result of this grievance was "covert action to cover up the illegal action." (Dkt. No. 1 at 4.) In his response to Defendants' summary judgment motion, Plaintiff elaborates, explaining that he "tryied [sic] to file a grievance at Great Meadow but it was thrown away." (Dkt. No. 34 at 4, ¶ 2.)

Turning first to the question of whether Plaintiff's "original grievance" amounted to "proper exhaustion" under the PLRA, Plaintiff argues that the Great Meadow administration's act of sabotage foreclosed him from pursuing further administrative remedies, rendering them unavailable. However, even if the Court were to accept as true Plaintiff's claim that his grievance "was thrown away" by Great Meadow administration in an attempt to thwart him, Great Meadow's culpable conduct does not excuse Plaintiff's failure to appeal this grievance to the next level. To complete the grievance process and satisfy the PLRA's exhaustion requirement, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC. 7 N.Y.C.R.R. § 701.6(g) ( "[M]atters not decided within the time limits may be appealed to the next step."); *see also Goodson v. Silver,* No. 9:09–cv–0494, 2012 WL 4449937, at \*4, 2012 U.S. Dist. LEXIS 137177, at \*36–37 (N.D.N.Y. Sept.25, 2012); *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at \*2 & n. 4, 2010 U.S. Dist. LEXIS 32014, at \*6 (N.D.N.Y. Mar. 31, 2010) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process."). Although Plaintiff asserts that he filed a grievance with Great Meadow about the claims set forth in this action, he failed to file an appeal of this grievance with CORC when the IGRC failed to respond. Without filing such an appeal to his original grievance, Plaintiff has not satisfied the exhaustion requirements of the PLRA. *Woodford,* 548 U.S. at 93.

 **\*9** Plaintiff is unable to establish exhaustion of remedies by reference to his second grievance for the same reason. As with his "original grievance" about the May 21, 2010, incident, Plaintiff failed to appeal the decision rendered

by the Clinton IGRC to the next level in the IGP process. Indeed, the evidence demonstrates that Plaintiff never filed any appeals whatsoever concerning the claims in this action. Because Plaintiff failed to pursue any of his complaints—formal or informal—to completion, I find that Plaintiff failed to "properly exhaust" his claims in this action as required by the PLRA. *Woodford,* 548 U.S. at 93.

### 2. Application of *Hemphill v. New York, 380 F.3d 680 (2d Cir.2004)*

Having found that Plaintiff has not exhausted his administrative remedies, the Court turns its attention to the three-part exhaustion inquiry articulated by the Second Circuit in *Hemphill* to determine whether dismissal on failure to exhaust grounds is appropriate here. *Hemphill,* 380 F.3d at 686.

#### a. *Availability of Remedies*

Applying the three-step analysis set forth in *Hemphill* to the present case, I first conclude that there was an internal administrative remedy available to Plaintiff. As explained above, New York prison inmates are subject to the inmate grievance procedure established by DOCCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96–cv–5396 (GBD), 2004 WL 324898 at *4, 2004 U.S. Dist. LEXIS 2492, at *17–18 (S.D.N.Y. February 20, 2004) (*citing Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)).[5] Here, the IGP provided an available administrative remedy to Plaintiff. This remedy remained available to Plaintiff despite the Great Meadow administration's alleged efforts to prevent filing of his initial grievance because, as discussed above, Plaintiff still had the opportunity to file an appeal as necessary to complete the grievance process when the Great Meadow IGRC failed to respond. *See* 7 N.Y .C.R.R. § 701.6(g) (stating that "matters not decided within the time limits may be appealed to the next step.")

[5] The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

#### b. *Estoppel*

After determining the existence of "available remedies," the second step under *Hemphill* is to "inquire as to whether

[some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686. (citations omitted). Here, Plaintiff does not assert that the individual Defendants themselves inhibited through threats or other conduct his ability to exhaust the administrative remedies available through the DOCCS IGP. As such, estoppel is inapplicable in the present case.

**\*10** Although not attributed to any of the individual Defendants, Plaintiff does contend, as discussed *supra,* that Great Meadow administration prevented him from filing his grievance by throwing it away. Great Meadow's actions in this respect cannot be used as a basis for estoppel because, as discussed above, Plaintiff still has the opportunity—and indeed responsibility—to file an appeal when he failed to receive a response to this grievance. As such, Defendants are not estopped from asserting exhaustion as a defense in this case.

#### c. *Special Circumstances*

As for the third step of the *Hemphill* analysis, the Second Circuit instructs the court to "consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* Liberally construed, Plaintiff argues in his response to Defendants' summary judgment motion that such "special circumstances" are present in this case and consist of a combination of some or all of the following five circumstances: (1) that he attempted to file a timely grievance about the May 21, 2010, incident through the Great Meadow IGP, but the Great Meadow administration refused to file said grievance; (2) that he initiated an investigation by the DOCCS Inspector General as an alternative means of redress after Great Meadow failed to respond to his initial grievance; (3) that after being transferred to Clinton Correctional Facility on July 1, 2010, he filed a second grievance on August 6, 2010, requesting that the IGRC ascertain why he had not received a response to his initial grievance concerning the May 21, 2010, incident; (4) that he attempted to appeal the IGRC's response to this second grievance; (5) that his exhaustion of all available appeals from Plaintiff's disciplinary conviction should be deemed sufficient exhaustion of remedies for purposes of his

section 1983 claims; and (6) that the fact he sent letters directly to DOCCS officials regarding the claims in this action should suffice to exhaust his administrative remedies in this action.

As discussed below, none of these circumstances justify Plaintiff's failure to comply with DOCCS' administrative procedure for the filing of grievances.

### i. First Circumstance Asserted by Plaintiff

The first "special circumstance" asserted by Plaintiff as an excuse for failing to exhaust his administrative remedies in this case is his claim that he "tryied [sic] to file a grievance at Great Meadow but it was thrown away." (Dkt. No. 34 at 4, ¶ 2.) Plaintiff's argument on this point is without merit. As discussed above, even if the Court accepts as true Plaintiff's contention that Great Meadow threw away rather than filed his grievance, this alleged action by Great Meadow does not excuse Plaintiff's failure to file an appeal when he realized that Great Meadow failed to respond. At that point, Plaintiff had the opportunity to complete the grievance process as required to exhaust his administrative remedies, but simply failed to do so. See 7 N.Y.C.R.R. § 701.6(g) (stating that "matters not decided within the time limits may be appealed to the next step."). Because Plaintiff failed to exhaust the administrative remedy available to him by appealing Great Meadow IGRC's non-response to this initial grievance to CORC, Plaintiff's allegation that Great Meadow threw away his initial grievance is not a "special circumstance" justifying an excuse from the PLRA's exhaustion requirement.

### ii. Second Circumstance Asserted by Plaintiff

**\*11** The second "special circumstance" asserted by Plaintiff as grounds excusing him from the exhaustion requirement in this case is the fact that the Inspector General ("IG") conducted an investigation of the excessive force allegations in this case. (Dkt. No. 1 at 6, ¶ 6; 1 at 4, ¶ 4(b)(I); 30–5 at 2, ¶ 7; 31–7 at 1–11; 31–8 at 1–11; 31–9 at 1–11; 31–10 at 1–11.) Plaintiff argues that this investigation was a suitable substitute for pursuing his complaint through the inmate grievance process and should thus be deemed sufficient proof of exhaustion. Plaintiff is incorrect.

In their motion, Defendants confirm that the IG did indeed conduct an investigation into Plaintiff's allegations of excessive force by Defendants Lamb, Drum, and Hamel. (Dkt. No. 30–1 at 7; 31–8 at 1–11; 31–9 at 1–11; 31–10 at 1–11.) According to the IG's confidential report of the investigation, which Defendants filed as part of the summary judgment record, this investigation was initiated by an oral complaint from Plaintiff's fiancé. (Dkt. No. 30–5 at 2, ¶ 7; 31–7 at 1–11; 31–8 at 1–11; 31–9 at 1–11; 31–10 at 1–11.) More specifically, the report states that the investigation was referred by "Anita Gavin-[Plaintiff's] Fiancé." (Dkt. No. 31–7 at 4.) The report also states that the IG received a letter on May 25, 2010, from a fellow inmate of Plaintiff containing the same allegations as those articulated by Ms. Gavin. Id. A copy of this letter is included in the IG's confidential report. (Dkt. No. 31–7 at 7–9.) In it, the author alleges that Plaintiff was the victim of excessive force and failure to provide medical care by Great Meadow staff during and after the May 21, 2010, incident; no reference is made in this letter to retaliation by Defendant Pegano, however. (Dkt. No. 31–7 at 7.)

According to the investigation report submitted by Defendants, the IG concluded based on its investigation that the allegations of excessive force arising from the May 21, 2010, incident were unsubstantiated and, as such, recommended that the case be closed. (Dkt. No. 31–7 at 2.) Nothing on the record suggests that Plaintiff appealed the IG's adverse finding to CORC, nor does Plaintiff himself assert that such an appeal was ever filed. [6]

[6]     IGRC records submitted by Defendants indicate that as of March 27, 2012, Plaintiff has pursued a total of 83 grievance appeals to CORC. (Dkt. No. 30–3 at 1, ¶ 1.) Of these 83 appeals, Hale states that 23 originated at the Great Meadow Correctional Facility. Id. at 4. There is no indication in the record maintained by CORC that Plaintiff ever filed an appeal from the IG's investigation findings concerning Plaintiff's claims in the present suit. (Dkt. No. 30–3, 3–7; 30–4, 1–3.)

As Judge Suddaby recently explained in Goodson v. Silver, No. 9:09–cv–0494 (GTS/DRH), 2012 WL 4449937, 2012 U.S. Dist. LEXIS 137177 (N.D.N.Y. Sept. 25, 2012), "[d]istrict courts appear to uniformly agree that, without a referral from a superintendent, an IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement; rather, the inmate must still appeal the IG's conclusion of unsubstantiation to CORC." Id. at *9 (citing Stephenson v. Dunford, 320 F.Supp.2d 44, 46, 52 (W.D.N.Y.2004) (finding no exhaustion where inmate failed to pursue grievance all

the way to CORC following investigation and finding of unsubstantiation by IG), *vacated on other grounds,* 139 F. App'x 311 (2d Cir.2005)); *Johnson v. Fernandez,* No. 09–CV–0626 (FJS/ATB), 2011 WL 7629513, at *5, 2011 U.S. Dist. LEXIS 154404, at *15–16 (N.D.N.Y. Mar.1, 2011) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by IG), *adopted by* 2012 WL 1033652, 2012 U.S. Dist. LEXIS 41926 (N.D.N.Y. Mar 27, 2012).[7]

[7]     *See also Jacoby v. Phelix,* No. 07–CV–0872 (DNH/ATB), 2010 WL 1839299, at *8–9 & n. 15, 2010 U.S. Dist. LEXIS 44222, at *10–11 & n. 15 (N.D.N.Y. March 31, 2010) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by IG), adopted by 2010 WL 1839264, 2010 U.S. Dist. LEXIS 44201 (N.D.N.Y. May 06, 2010); *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 303–04 (W.D.N.Y.2004) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following "investig[ation] by [the] Inspector Gen[eral]"); *McNair v. Jones,* No. 01–CV–3253 (RCC) (GWG), 2002 WL 31082948 at *4, 2002 U.S. Dist. LEXIS 17409, at *22–23 (S.D.N.Y. Sept. 18, 2002) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following investigation and finding of unsubstantiation by IG); *Houze v. Segarra,* 217 F.Supp.2d 394, 395–96 (S.D.N.Y.2002) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following IG's investigation and finding that there was "no merit to [the inmate's] allegations"); *Grey v. Sparhawk,* No. 99–CV–9871 HB, 2000 WL 815916, at *2, 2000 U.S. Dist. LEXIS 8656, at *5 (S.D.N.Y. June 23, 2000) (rejecting inmate's argument that "the Inspector General's investigation, if any, into the matter exhausts the administrative procedures"); *cf. Tapp v. Kitchen,* No. 02–CV–6658 CJS, 2004 WL 2403827, at *8, 2004 U.S. Dist. LEXIS 29972, at *25–26 (W.D.N.Y. Oct.26, 2004) ("Plaintiff's argument in this regard is further undercut by the fact that he never followed up on his complaint to the Inspector General after he failed to receive any kind of a decision."); *Velez v. Kulhmann,* No. 02–CV–6062 AKH, 2003 WL 22004899, at *3, 2003 U.S. Dist. LEXIS 14684, at *10–11 (S.D.N.Y. Aug.22, 2003) (finding no exhaustion where inmate failed to pursue grievance all the way to CORC following his complaint to an IG investigator).

**\*12** Applying this rule of law here, the IG investigation asserted by Plaintiff as a "special circumstance" justifying his failure to exhaust administrative remedies fails. As in the cases cited above, the IG's investigation in this case was not initiated by a referral from the superintendent as required to fall within the purview of the inmate grievance process; it was a referral from Plaintiff's fiancé that initiated the investigation. (Dkt. No. 31–7 at 4.) As a result, pursuant to the rule articulated by the Court in *Goodson,* the IG's investigation into the conduct of the correction officers involved does not excuse Plaintiff from the PLRA's exhaustion of remedies requirement. *Goodson,* 2012 WL 4449937, at *9, 2012 U.S. Dist. LEXIS 137177, at *36–37. To satisfy the exhaustion requirement, Plaintiff was required to appeal the IG's adverse finding, which he failed to do. *Id.* As such, the second circumstance asserted by Plaintiff as grounds for excusing the PLRA's exhaustion requirement fails.

*iii. Third Circumstance Asserted by Plaintiff*
As his next basis for relief from the PLRA's exhaustion requirement, Plaintiff points to the fact that on August 6, 2010, after Great Meadow failed to respond to his grievance concerning the May 21, 2010, incident, he filed a second grievance with the IGRC at Clinton. (Dkt. No. 34 at 4.) Plaintiff had been transferred from Great Meadow to Clinton on July 1, 2010, several weeks after he allegedly filed his initial grievance concerning the May 21, 2010, incident with the Great Meadow IGRC. In this second grievance, dated August 6, 2010, Plaintiff requested that the committee members ascertain why the Great Meadow IGRC had failed to respond to his original grievance. (Dkt. No. 34 at 21–22.)

In response to Plaintiff's August 6, 2010, grievance, the Clinton IGRC issued the following decision in the designated space on the grievance form: "Grievant is advised there is no record of any grievance of this issue at GMCF. Grievant may write to S. Woodward, IGPS, at GMCF for additional information concerning his GMCF grievances." (Dkt. No. 30–1 at 7; Dkt. No. 34 at 22.)

Turning first to Plaintiff's contention that his filing of the August 6, 2010, grievance constitutes a "special circumstance" pursuant to *Hemphill,* neither the law nor the facts support Plaintiff's position in this respect. As discussed above, where, as alleged here, the IGRC fails to respond with a timely determination of an inmate's grievance, that inmate must nonetheless proceed with

the grievance process by filing an appeal in the same manner as if IGRC had responded with an adverse determination of his grievance. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *see also Goodson v. Silver,* No. 9:09–cv–0494 (GTS/DRH), 2012 WL 4449937, at *4, 2012 U .S. Dist. LEXIS 137177, at *12 (N.D.N.Y. Sept. 25, 2012); *Murray v. Palmer,* No. 03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *2 n. 4, 2010 U.S. Dist. LEXIS 32014, at *6 n. 4 (N.D.N.Y. Mar.31, 2010). Given its clear language, the relevant New York Code, 7 N.Y.C.R.R. § 701.6(g), created an "available remedy" for Plaintiff in this case, which is unequivocal. Once he realized that Great Meadow had failed to decide his grievance within the required time line, his "available remedy" under 7 N.Y.C.R.R. § 701.6(g) was to proceed with the administrative process by "appeal[ing] to the next step." *Id.* Plaintiff elected to not to pursue his available remedy, however, and thus failed to exhaust his administrative remedies as required under the PLRA. Given this factual framework and the remedy available to the Plaintiff had he simply chosen to follow proper procedure, Plaintiff's attempt to characterize his August 6, 2010, grievance as a "special circumstance" under the third prong of the *Hemphill* test is unsupported by the evidence. Plaintiff chose not to complete the grievance process by exercising his right to appeal his claims concerning the May 21, 2010, incident to the next step; the mere fact that he decided nearly two months later to file a grievance complaining about Great Meadow's handling of his initial grievance does not excuse Plaintiff's failure to exhaust his administrative remedies as required by the PLRA. As such, the third special circumstance offered by Plaintiff as justification for his failure to exhaust available administrative remedies fails.

### iv. Fourth Circumstance Asserted by Plaintiff

**\*13** The fourth "special circumstance" Plaintiff cites as an excuse for failing to exhaust his administrative remedies is an extension of the third circumstance discussed above. Plaintiff asserts that in addition to filing the August 6, 2010, grievance, he also took all the necessary steps to appeal the Clinton IGRC's decision on this second grievance. (Dkt. No. 34 at 4–5.) He argues that even though his attempts to appeal this second grievance were ultimately thwarted, his efforts toward exhaustion of this second claim amount to a "special circumstance" precluding dismissal of his claims for failure to exhaust. *Id.*

Plaintiff's argument in favor of this fourth circumstance as an excuse for his failure to exhaust available administrative remedies fails for a number of reasons. First, his attempted appeal of the August 6, 2010, grievance—the grounds identified by Plaintiff as his fourth "special circumstance"—is dependent upon a finding in his favor on the third circumstance—i.e., that Plaintiff's filing of the August 6, 2010, grievance itself is a "special circumstance" excusing the exhaustion requirement imposed by the PLRA. This is not the case, however, for the reasons discussed above. Since Plaintiff failed to exercise the administrative remedies made available to him by 7 N.Y.C.R.R. § 701.6(g), he was unable to excuse his inaction by filing a separate grievance approximately two months later. Because the filing of the August 6, 2010, grievance is insufficient to establish a "special circumstance" excusing Plaintiff from the PLRA's exhaustion requirement, the fact that Plaintiff attempted to appeal the decision on this grievance is irrelevant. As with the third circumstance discussed above, Plaintiff's argument in favor of this fourth circumstance as precluding dismissal based on exhaustion thus must fail.

Before exploring alternative bases for evaluating Plaintiff's claim, it is worth noting that the parties offer conflicting versions of facts surrounding Plantiff's alleged attempt to appeal the decision of the Clinton IGRC on Plaintiff's August 6, 2010, grievance. Below the IGRC members' signature line, toward the bottom of the form, there is space provided for Plaintiff to check a box indicating whether or not he agrees with the ICRG's decision and whether he elects to appeal said decision to the superintendent. (Dkt. No. 34 at 22.) The form states that the grievant has seven days from receiving the IGRC's decision to return the signed form to prison administration. *Id.*

Although both parties acknowledge that Plaintiff filed the August 6, 2010, grievance with the Clinton IGRC, the question of whether Plaintiff ever properly elected to appeal Clinton's decision by signing and returning the appropriate portion of the form is the subject of dispute between the parties. Plaintiff claims that after receiving the Clinton IGRC's response, he checked the box on the form indicating that he disagreed with the decision and wished to appeal the IGRC decision to the superintendent and then returned the signed form within seven days as required. (Dkt. No. 38–1 at 10 ¶ 3.) In support of his position, Plaintiff submits a copy of the August 6, 2010,

grievance form with Plaintiff's signature and election to appeal visible on the form. (Dkt. No. 34 at 22.) Plaintiff's signature does not appear on a different copy of the form, however, making it appear as if Plaintiff never completed the appellate election portion of the form as he claims. (Dkt. No. 34 at 24.) Defendants argue that this is the authentic version of the form. (Dkt. No. 31 at 7.)

**\*14** In opposition to the version of facts suggested by Defendants' copy of the form, Plaintiff asserts that said copy is a "false grievance form" sent by Defendants to deceive the Court into believing that Plaintiff "never sign[ed] it for further action." (Dkt. No. 34 at 4.) In addition to the absence of Plaintiff's signature on the copy that Defendants claim is authentic, the other key difference between the forms is in the signatures of the IGRC members. The copy of the grievance form on which Defendants rely contains the signatures of the IGRC members in the designated signature lines and a date stamp indicating that the date returned to the inmate was August 11, 2010. (Dkt. No. 34 at 24.) Neither the IGRC members' signatures nor the date returned to inmate appear on the Plaintiff's version, however, as the spaces for these items are left blank. (Dkt. No. 34 at 22.)

Although the discrepancies highlighted above demonstrate disputed issues of fact regarding Plaintiff's reaction to the August 11, 2010, IGRC decision, this dispute is irrelevant to the Court's evaluation of the Plaintiff's "special circumstance" argument at issue here. Even if the Court accepts Plaintiff's version of the facts in its entirety, Plaintiff does not contend that he followed the grievance process to completion as to this August 6, 2010, grievance by appealing to CORC, a remedy available to him under 7 N.Y.C.R.R. § 701.6(g) when the superintendent failed to issue a timely decision on his first line appeal. Because he failed to exhaust his available administrative remedies even for his second, "substitute" grievance filed after his initial grievance about the May 21, 2010, incident was allegedly thrown away by Great Meadow staff, Plaintiff is unable to establish that his abandoned attempts to pursue this appeal should excuse his failure to exhaust administrative remedies in pursuing the original grievance in this case. Plaintiff's argument that this alleged attempt to appeal the August 11, 2010, decision of the Clinton IGRC constitutes a "special circumstance" justifying his failure to exhaust under *Hemphill* thus fails.

*v. Fifth Circumstance Asserted by Plaintiff*

The fifth circumstance cited by Plaintiff as grounds for excusing his failure to exhaust available administrative remedies is the fact that he did appeal the Tier III disciplinary conviction and sentenced imposed by Defendant Pegano to exhaustion. Liberally construed, Plaintiff argues that this appeal of his underlying disciplinary conviction and sentence should be applied to his claims in the present case and that dismissal of these claims for failure to exhaust under the PLRA is therefore inappropriate. Plaintiff is incorrect.

The Second Circuit has held that, under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano v. Goord,* 380 F.3d 670, 678–79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). Such circumstances exist only where "(1) the inmate reasonably believed that his 'only available remedy' was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim." *Murray v. Palmer,* No. 03–CV–1010 (GTS/GHL), 2010 WL 1235591, at \*3, 2010 U.S. Dist. LEXIS 32014, at \*14 (N.D.N.Y. Mar.31, 2010).

**\*15** In *Giano v. Goord,* the Second Circuit excused an inmate's failure to file a grievance regarding his complaint that a correction officer had initiated a retaliatory disciplinary charge against him where the inmate had appealed the disciplinary conviction resulting from the allegedly retaliatory charge and had raised his retaliation complaint as part of the appeal. The basis for the court's decision in *Giano* was its conclusion that the plaintiff had reasonably misinterpreted regulations to mean that his only administrative recourse was to appeal his disciplinary conviction. *Giano,* 380 F.3d at 676, 679 (holding that prisoner's failure to exhaust with respect to the retaliation claim was justified). Because the plaintiff's actions were the result of reasonable confusion about the proper administrative channel through which to pursue his claim, the court found that the plaintiff had demonstrated the presence of special circumstances justifying his failure to comply with the PLRA's exhaustion requirement. *Id.*

Here, unlike in *Giano,* the evidence does not support a finding that Plaintiff reasonably believed his "only available remedy" was to raise his claims as part of a

tier disciplinary hearing. To the contrary, Plaintiff in fact claims to have initiated grievances related to his claims in this action on at least two occasions, allegations indicating that he understood that this was the proper administrative process to pursue with respect to these complaints. *Neree v. O'Hara,* No. 9:09–CV–802, 2011 WL 3841551, *7, 2011 U.S. Dist. LEXIS 96640, at *24 (N.D.N.Y. June 20, 2011); *see also Reynoso v. Swezey,* 238 F. App'x. 660, 663 (2d Cir.2007) (holding that where plaintiff filed a grievance with respect to the retaliation claim, but failed to appeal the denial to CORC, his failure to exhaust was not excused in light of evidence of his awareness that the grievance process was the appropriate administrative remedy). Because the record indicates that Plaintiff knew that the inmate grievance process was the proper administrative channel for the claims in this action, the fact that Plaintiff raised these claims in his disciplinary appeal does not excuse his failure to exhaust administrative remedies in the present case. As such, the fifth circumstance asserted by Plaintiff is without merit.

*vi. Sixth Circumstance Asserted by Plaintiff*
As the final "special circumstance" he asserts, Plaintiff cites the court to multiple letters he allegedly has written to various DOCCS officials about the claims in this action. Specifically, Plaintiff states:

> So it was grievance department officials who impede[sic] obstruct the procedure of grievance, so I myself wrote the commission Brian Fischer and Keren Bellamy Director in Albany of the Grievance Department, but those letter [sic] and response[sic] from these officials are in exhibits in *Dabney v. Sawyer,* 11–cv–0273 (LEK/RFT) which in [sic.] Exhibit (A) and (E) if the court wish to verify this they can ask the clerk or judge to check these letter to both was on the felonious assault May 21, 2010.

**\*16** (Dkt. No. 34 at 5, ¶ 4.) Although he refers the Court to exhibits "(A) and (E)" in *Dabney v. Sawyer,* 11–cv–0273, a separate civil action with fifty-eight docket entries, Plaintiff fails to identify the specific docket number or type of filing to which these exhibits are attached.

Local Rule 7.1, which provides the procedure for filing a summary judgment motion in this district, requires that the movant set forth the undisputed facts that, it contends, entitles it to summary judgment in a Statement of Material Facts. *See* N.D.N.Y.L.R. 7.1(a)(3). Once a Rule 7.1(a)(3) Statement of Material Facts is submitted, the non-moving party must file a response to the movant's Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs." *Id.* "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.* Conclusory denials unsupported by specific citations to the record are insufficient. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005).

Here, as a preliminary matter, I note that Plaintiff's reference to an unidentified exhibit filed in a separate action does not comply with Local Rule 7.1(a)(3)'s requirement that denials be supported by specific citations to the record. Despite his failure to comply with local rules in this respect, however, I have reviewed the docket entries in *Dabney v. Sawyer,* 9:11–cv–0273, and have found two letters that appear to correspond to those referenced by Plaintiff as the above mentioned sixth circumstance excusing his failure to exhaust. The first is a letter from Karen Bellamy to Plaintiff dated December 15, 2010. (*Dabney v. Sawyer,* 9:11–cv–0273, Dkt. No. 52–1 at 39.) In this letter, Ms. Bellamy acknowledges receipt of correspondence from Plaintiff dated November 19, 2010, and advises Plaintiff that "[c]ontact with the facility administration reveals that CL–60134–10 was heard by the IGRC on August 11, 2010 and you did not appeal." *Id.* The letter instructs Plaintiff to direct future inquiries to the IGP supervisor. *Id.*

The second letter is from Deputy Commissioner Lucien Leclaire and appears to be a response to a letter from Plaintiff to Commissioner Fischer. (*Dabney v. Sawyer,* 9:11–cv–0273, Dkt. No. 52–1 at 2.) In the letter, dated December 27, 2010, Leclaire states that the Commissioner asked him to respond to Plaintiff's letter regarding "medical care, alleged assault and misconduct by staff at the Clinton and Great Meadow Correctional Facilities." *Id.* Concerning the allegations of assault and misconduct, Leclaire summarizes the information on the record about the May 21, 2010, incident and the disciplinary findings against Plaintiff resulting from the May 25, 2010,

hearing. *Id.* The letter then reiterates that "[u]pon review of the information presented in this investigation, the superintendent found no evidence to substantiate your allegations." *Id.* Finally, the letter instructs Plaintiff to direct future inquiries to facility officials. *Id.* [8]

[8] Although the letters from both Bellamy and Leclaire state that they are written in response to letters from Plaintiff, these letters are incorporated by reference only and do not appear to have been filed as part of Plaintiff's exhibits in *Dabney v. Sawyer,* 9:11–cv–0273.

**\*17** Under the Supreme Court's holding in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), proper exhaustion requires that a plaintiff procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Id.* at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford*). In *Woodford,* the Supreme Court explained that the PLRA requires "proper exhaustion," which " 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).' " *Woodford,* 548 U.S. at 90 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)). Because it is "proper exhaustion" that is required by the PLRA, an inmate's attempt to exhaust by simply writing a letter directly to prison administration generally will not suffice to exhaust administrative remedies under the PLRA. *See Hooks v. Howard,* No. 907–CV–0724 (TJM/RFT), 2010 WL 1235236, at \*3, 2010 U.S. Dist. LEXIS 30589, at \*6–7 (N.D.N.Y. Mar.30, 2010); *Grey v. Sparhawk,* No. 99–CV–9871 HB, 2000 WL 815916, at \*2, 2000 U.S. Dist. LEXIS 8656, at \*5 (S.D.N.Y. June 23, 2000) (holding that a complaint filed directly with the IG did not excuse plaintiff from "adhering to the available administrative procedures"). [9] In writing letters directly to prison administrators Bellamy and Fischer, Plaintiff elected to disregard the procedure established by the IGP and required by the PLRA to establish "proper exhaustion." *Woodford,* 548 U.S. at 90. As such, the fact that Plaintiff wrote these letters should not be deemed a "special circumstance" excusing his failure to properly exhaust administrative remedies in this case. *Id.* To hold that inmates like Plaintiff may circumvent the exhaustion requirement simply by including his complaints in a letter to prison administration would be to frustrate the purpose of the exhaustion rule. *Id.* As such, the sixth basis asserted by Plaintiff as grounds for excusing his non-exhaustion fails.

[9] Although an inmate's unsuccessful attempt to resolve a complaint by writing a letter to prison administration will not suffice to exhaust an inmate's administrative remedies, note that "a grievance through informal channels will satisfy the exhaustion requirement *if the prisoner thereby obtained a favorable resolution of his grievance." Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (citations omitted) (emphasis added). The exhaustion requirement is satisfied in such a case because the inmate would not have had any reason to appeal a favorable resolution and thus would be relieved of the duty to complete the grievance process. *Andrews v. Cruz,* No. 04–CV–566 (PAC)(RLE), 2010 WL 1141182, at \*6, 2010 U.S. Dist. LEXIS 28124, at \*16 (S.D.N.Y. Mar. 24, 2010) (citations omitted).

### 2. *Failure to Exhaust: Conclusion*

As set forth above, Plaintiff failed to exhaust his available administrative remedies before commencing the present suit. The evidence indicates that administrative remedies were available to him at the time his claims arose, but that he chose not to pursue said remedies. *Hemphill,* 380 F.3d at 686. Despite Plaintiff's assertions to the contrary, there is no evidence on the record to plausibly suggest that Defendants should be estopped from asserting exhaustion as an affirmative defense or that any "special circumstances" exist in this case justifying his failure to exhaust. I therefore recommend that the Court grant Defendants' motion for summary judgment based on Plaintiff's failure to exhaust available administrative remedies.

### B. *Heck v. Humphrey*

In the event that the Court disagrees with my recommendation that summary judgment be granted on exhaustion grounds, and to ensure complete analysis of the issues, I turn next to Defendants' contention that the "favorable termination rule" bars Plaintiff's claims in the present case. (Dkt. No. 30–1 at 9–11.) As an alternative basis for summary judgment, Defendants argue that the favorable termination rule articulated in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and its progeny mandates dismissal based on the prior adjudication of Plaintiff's disciplinary violations in this case. (Dkt. No. 30–1 at 9–11.) Defendants assert that Plaintiff is prohibited from litigating his claims in this action under the favorable termination rule because

an outcome in Plaintiff's favor on these claims would necessarily imply the invalidity of his Tier III disciplinary conviction and sentence. (Dkt. No. 30–1 at 10.)

**\*18** In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that "in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–87.

In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Supreme Court extended *Heck's* favorable termination rule to disciplinary adjudications, holding that a prisoner's claim for damages was not cognizable under § 1983 where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his [disciplinary] conviction." *Id.* at 643. If a plaintiff whose success would necessarily invalidate said confinement or its duration does not satisfy *Heck's* favorable termination rule, he must seek relief through the federal habeas corpus statute rather than through § 1983. *Peralta v. Vasquez,* 467 F.3d 98, 104 (2d Cir.2006). [10]

[10] In *Peralta,* the Second Circuit found "that the purpose of the Heck favorable termination requirement is to prevent prisoners from using § 1983 to vitiate collaterally a judicial or administrative decision that affected the overall length of their confinement, and that punishments related to their term of imprisonment, or the procedures that led to them (if the procedural defect at issue was critical to the imposition of the punishment), must be attacked through a habeas petition." *Id.,* 467 F.3d at 104.

### 1. *Excessive force claim against Defendants Lamb, Drum, and Hamel*

In support of summary judgment on Plaintiff's excessive force claim, Defendants argue that success on this claim "unquestionably would imply the invalidity of his conviction. Plaintiff's claim of excessive force therefore is not cognizable." (Dkt. No. 25–1 at 6.) As such, Defendants argue that the favorable termination rule

applies and that, as a result, Plaintiff's retaliation claim is barred.

To prevail on a claim of excessive force against prison officials under the Eighth Amendment, the lynchpin inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm ." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "In determining whether the use of force was wanton and unnecessary," the court should evaluate "the need for application of force, relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* at 7 (citation and quotation marks omitted).

Regarding the application of *Heck* to excessive force claims, the Second Circuit has explained that the favorable termination rule does not apply to claims where the alleged "use of excessive force lacks the requisite relationship to the conviction." *Jackson v. Suffolk Cnty. Homicide Bureau,* 135 F.3d 254, 257 (2d Cir.1998). For this "requisite relationship" to exist and the favorable termination rule to apply, the particulars of the excessive force claim must be such that the plaintiff's success on said claim *necessarily* implies the invalidity of a prior disciplinary adjudication. *Id.* (emphasis added). If, on the other hand, the plaintiff's success on the excessive force claim in question *would not necessarily* invalidate a prior disciplinary conviction, the favorable termination rule does not apply and the claim is not barred. *Id.* (emphasis added).

**\*19** Given the nature of his disciplinary convictions and the allegations underlying his excessive force claim, Plaintiff's Tier III adjudication does not bar his excessive force claims in this case. As the basis for Plaintiff's disciplinary convictions, Defendant Pegano found, based on the evidence presented at the Tier III hearing, that Plaintiff was guilty of the following disciplinary violations arising from the May 21, 2010, incident: assault, weapons possession, refusing a direct order, and refusing a search and frisk. (Dkt. No. 30–8 at 3.) None of these convictions preclude a finding that the corrections officers also used excessive force against Plaintiff during this incident. *See Griffin v. Crippen,* 193 F.3d 89, 91–92 (2d Cir.1999) (appellant's guilty plea on assault charges against corrections officers did not bar

Eighth Amendment excessive force claim); *Jeanty v. Cnty. of Orange,* 379 F.Supp.2d 533, 543–44 (S.D.N.Y.2005) (denying summary judgment to defendant police officers where plaintiff pleaded guilty to assaulting police officer, but "a jury could reasonably conclude that ... after [plaintiff] had been subdued, he was subjected to excessive force by the individual defendants"). Because it is possible for a fact finder to accept the validity of Plaintiff's disciplinary convictions and still conclude that Defendants Drum, Hamel, and Lamb used excessive force, Plaintiff's excessive force claim does not "necessarily imply the invalidity of his conviction[s]." *Edwards,* 520 U.S. at 642. As such, the favorable termination rule is inapplicable to Plaintiff's excessive force claim.

In support of their position that the favorable termination rule does apply to the excessive force claims in this case, Defendants cite *Douglas v. Smith,* No. 05–CV–1000 (GTS/DRH), 2009 WL 789450, 2009 U.S. Dist. LEXIS 130720 (N.D.N.Y. Jan.26, 2009). In *Douglas,* the plaintiff, an inmate in the custody of DOCCS, faced criminal charges for assault in the second degree based on allegations that he had assaulted a correction officer while being escorted to his cell. 2009 WL 789450, at * 1. As a result of this incident, Douglas pleaded guilty to the lesser charge of attempted assault in the second degree and admitted as part of his plea that he intended "to cause physical injury [to the corrections officer] in order to prevent him from performing a lawful duty." *Id.* at * 2. (internal citations omitted). Following his conviction, Douglas filed a § 1983 action alleging that the correction officer had used excessive force during the altercation that was the basis of his criminal conviction. *Id.* at * 1. Ruling on the Defendants' motion for summary judgment, the Court in *Douglas* found that if the version of facts in Douglas' complaint were accepted, the correction officers would not have been performing a lawful duty during the time in question. *Id.* at * 2. Because the correction officer's performance of a lawful duty was conclusively established by Douglas' criminal conviction, success on his excessive force claim would necessarily invalidate Douglas' prior conviction. *Id.* The court thus held that the *Heck/Edward*s favorable termination rule precluded Douglas' excessive force claims and granted Defendants' motion for summary judgment on this ground. *Id.* at * 2–3.

**\*20** The facts of the present case make *Douglas* inapplicable here. In *Douglas,* the court found the favorable termination rule applicable due to the specific

nature of the plaintiff's underlying conviction in that case. There, the plaintiff was convicted of assault in the second degree, a criminal offense that required him to admit, as part of his guilty plea, that he intended "to cause physical injury [to the corrections officer] in order to prevent him from performing a lawful duty." *Id.* at * 2. As discussed above, a favorable outcome on the plaintiff's excessive force claim would require the plaintiff to prove that the corrections officer's use of force had been "wanton and unnecessary," a finding which would necessarily have invalidated Douglas' prior conviction. *Id.* Here, unlike in *Douglas,* Plaintiff's disciplinary convictions in this case conclusively established only the wrongfulness of Plaintiff's actions; they do not include a finding one way or the other concerning the lawfulness of the corrections officers' actions. As such, a finding that the corrections officers had used excessive force would not affect the validity of Plaintiff's disciplinary convictions. The favorable termination rule is thus inapplicable to Plaintiff's excessive force claim, making summary judgment on this ground inappropriate.

### 2. *Failure to intervene claim against Defendant Livermore*

Defendants also argue in their motion for summary judgment that Plaintiff's failure to intervene claim against Defendant Livermore is precluded by Plaintiff's disciplinary convictions under the favorable termination rule and should be dismissed. (Dkt. No. 30–1 at 3, n. 1.) To prevail on a failure to intervene claim, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10–CV–0456 (GTS/DEP), 2011 WL 5975027, at *4, 2011 U.S. Dist. LEXIS 136583, at *13 (N.D.N.Y. Nov.29, 2011) (citing *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)); *see also Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

Here, Plaintiff's prior disciplinary convictions do not preclude his failure to intervene claim in the present action. As with his excessive force claims, the fact that

he has been found guilty of these disciplinary violations does not prevent Plaintiff from proving that Defendant Livermore is also liable for failing to intervene to protect Plaintiff from Defendants Drum, Lamb, and Hamel. Because a favorable determination on his failure to intervene claim against Defendant Livermore would not necessarily imply the invalidity of his prior disciplinary convictions, the favorable termination rule does not apply to this claim.

### 3. *Retaliation claim against Defendant Pegano*

**\*21** Finally, Defendants argue that summary judgment is appropriate on Plaintiff's retaliation claim against Defendant Pegano based on the favorable termination rule. (Dkt. No. 30–1 at 15.)

As the basis for his retaliation claim, Plaintiff alleges that Pegano denied him the assistance necessary to attend his Tier III disciplinary hearing in retaliation for naming him as a defendant in *Dabney v. Lapolt*, No. 10–CV–0519, a civil rights action filed by Plaintiff in 2010. (Dkt. No. 1 at 9.) To prevail on a First Amendment retaliation claim, a plaintiff must establish first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials. *See Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997) (alleging retaliatory transfers).

Applying the elements above to the factual allegations here, success on Plaintiff's retaliation claim requires him to prove that Pegano's failure to provide him with assistance prior to and during the disciplinary hearing amounted to a deprivation of due process and that Plaintiff's then-pending civil rights suit was a substantial or motivating factor for Pegano's actions. *Id.* Because such a finding would directly undermine Plaintiff's disciplinary convictions, I conclude that success on Plaintiff's retaliation claim would necessarily imply the invalidity of his prior disciplinary convictions by calling into question the fairness of the earlier proceeding and the motivation of the fact finder. *Edwards,* 520 U.S. at 642; *see also Duamutef v. Morris,* 956 F.Supp. 1112, 1116 (S.D.N.Y.1997) (dismissing plaintiff's First Amendment retaliation claim where such claim, if established, would imply the invalidity of his conviction); *Sheldon v. Hundley,* 83 F.3d 231, 233 (8th Cir.1996) (dismissing First Amendment free speech claim where success on the claim

would "necessarily imply the invalidity of a disciplinary result lengthening the plaintiff's prison sentence"). Based on the foregoing, Plaintiff's retaliation claim is precluded under the favorable termination rule.

### 4. *Application of Heck v. Humphrey: Conclusion*

Because success on Plaintiff's retaliation claim would necessarily imply the invalidity of his prior disciplinary convictions, *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), precludes plaintiff's retaliation claim against Defendant Pegano in this action. I therefore recommend that defendant's motion for summary judgment as to Plaintiff's retaliation claim against Defendant Pegano be granted on this basis. Because the favorable termination rule does not apply to Plaintiff's excessive force and failure to intervene claims, I recommend that Defendants' motion for summer judgment based on *Heck v. Humphrey* be denied as to these claims. However, as discussed above, summary judgment in Defendants' favor is appropriate as to Plaintiff's excessive force and failure to intervene claims based on Plaintiff's failure to exhaust his administrative remedies.

**\*22 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of the following unreported cases: *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, 2006 U.S. Dist. LEXIS 65221; *Goodson v. Silver,* No. 9:09–cv–0494, 2012 WL 4449937, 2012 U.S. Dist. LEXIS 137177 (N.D.N.Y. Sept.25, 2012); *Mingues v. Nelson,* No. 96–cv–5396, 2004 WL 324898, 2004 U.S. Dist. LEXIS 2492 (S.D.N.Y. February 20, 2004); *Murray v. Palmer,* No. 03–CV– 1010, 2010 WL 1235591, 2010 U.S. Dist. LEXIS 32014 (N.D.N.Y. Mar. 31, 2010); *Johnson v. Fernandez,* No. 09–CV–0626, 2011 WL 7629513, 2011 U.S. Dist. LEXIS 154404 (N.D.N.Y. Mar. 1, 2011); *Jacoby v. Phelix,* No. 07–CV–0872, 2010 WL 1839299, 2010 U.S. Dist. LEXIS 44222 (N.D.N.Y. March 31, 2010); *McNair v. Jones,* No. 01–CV–3253, 2002 WL 31082948, 2002 U.S. Dist. LEXIS 17409 (S.D.N.Y. Sept. 18, 2002); *Grey v. Sparhawk,* No. 99–CV–9871, 2000 WL 815916, 2000 U.S. Dist. LEXIS 8656 (S.D.N.Y. June 23, 2000); *Tapp v. Kitchen,* No. 02–CV–6658, 2004 WL 2403827, 2004 U.S. Dist. LEXIS 29972 (W.D.N.Y. Oct.26, 2004); *Velez v. Kulhmann,* No.

Dabney v. Pegano, Not Reported in F.Supp.2d (2013)
Case 9:13-cv-01271-DNH-TWD Document 85 Filed 02/16/18 Page 48 of 98
2013 WL 5464776

02–CV–6062, 2003 WL 22004899, 2003 U.S. Dist. LEXIS 14684 (S.D.N.Y. Aug.22, 2003); *Neree v. O'Hara,* No. 9:09–CV–802, 2011 WL 3841551, 2011 U.S. Dist. LEXIS 96640 (N.D.N.Y. June 20, 2011); *Reynoso v. Swezey,* 238 F. App'x. 660, 663 (2d Cir.2007); *Hooks v. Howard,* No. 907–CV–0724, 2010 WL 1235236, 2010 U.S. Dist. LEXIS 30589 (N.D.N.Y. Mar.30, 2010); *Douglas v. Smith,* No. 05–CV–1000, 2009 WL 789450, 2009 U.S. Dist. LEXIS 130720 (N.D.N.Y. Jan. 26, 2009). *Henry v. Dinelle,* No. 10–CV–0456, 2011 WL 5975027, 2011 U.S. Dist. LEXIS 136583(N.D.N.Y. Nov. 29, 2011); *Andrews v. Cruz,* No. 04–CV–566, 2010 WL 1141182, 2010 U.S. Dist. LEXIS 28124 (S.D.N.Y. Mar. 24, 2010).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5464776

---

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 18

2017 WL 4548439
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE
32.1 AND THIS COURT'S LOCAL RULE 32.1.1.
WHEN CITING A SUMMARY ORDER IN A
DOCUMENT FILED WITH THIS COURT, A PARTY
MUST CITE EITHER THE FEDERAL APPENDIX
OR AN ELECTRONIC DATABASE (WITH THE
NOTATION "SUMMARY ORDER"). A PARTY CITING
A SUMMARY ORDER MUST SERVE A COPY OF IT
ON ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals,
Second Circuit.

Christopher SHAPARD, Plaintiff-Appellant,
v.
John ATTEA, Correction Officer, Edwin
Mendez, Correction Officer, Robert Kyle,
Correction Officer, Defendants-Appellees,
Al Herdzik, Lieutenant, Martin Kearney, Captain,
Anthony Zon, Superintendent, Robert A.
Kirkpatrick, Superintendent, Thomas Schoellkopf,
Commissioner's Hearing Officer, Donald Selsky,
Director, Special Housing Unit, Defendants.

16-3764
|
October 12, 2017

**Synopsis**
**Background:** State inmate brought action against three
corrections officers, alleging that they used excessive force
in violation of § 1983 and the Eighth Amendment. The
United States District Court for the Western District of
New York, Siragusa, J., 2016 WL 4001362, sua sponte
dismissed the claims, on grounds that they were barred by
the *Heck* doctrine. Inmate appealed.

**[Holding:]** The Court of Appeals held that *Heck* doctrine
did not bar excessive force claims since a favorable

adjudication of those claims would not necessarily imply
the invalidity of inmate's prior assault conviction.

Vacated and remanded.

West Headnotes (1)

[1]     **Civil Rights**
        👉 Use of force;protection from violence
        State inmate's § 1983 excessive force claims
        against three corrections officers was not
        barred by the *Heck* doctrine, even though
        inmate was convicted of assaulting one of the
        officers during same incident, since favorable
        adjudication of excessive force claims would
        not necessarily imply the invalidity of his
        prior assault conviction; inmate's plausible
        claim of excessive force could be reconciled
        with his assault of corrections officer, since
        elements of excessive force and second degree
        assault under state law were not incompatible,
        and inmate's complaint did not deny that he
        assaulted the corrections officer. U.S. Const.
        Amend. 8; 42 U.S.C.A. § 1983; N.Y. Penal
        Law § 120.05(7).

        Cases that cite this headnote

Appeal from a judgment of the United States District
Court for the Western District of New York (Siragusa, J.).
**\*1  UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED AND DECREED** that the
judgment of the district court is **VACATED** and
**REMANDED**.

**Attorneys and Law Firms**

FOR    APPELLANT:    LUKE    X.    FLYNN-
FITZSIMMONS, (Cameron S. Friedman, on the brief),
Paul, Weiss, Rifkind, Wharton & Garrison LLP, New
York, NY.

FOR APPELLEES: PATRICK A. WOODS (Barbara
D. Underwood, Solicitor General, Andrea Oser, Deputy
Solicitor, General, on the brief), Assistant, Solicitor

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

2017 WL 4548439

General, for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY.

PRESENT: DENNIS JACOBS, JOSÉ A. CABRANES, RICHARD C. WESLEY, Circuit Judges.

**Opinion**

## SUMMARY ORDER

Christopher Shapard, an inmate in the New York State prison system, appeals the district court's sua sponte dismissal of his claims against defendants-appellees, three corrections officers at the Wende Correctional Facility. [1] Shapard alleged that the officers used excessive force in violation of 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. The United States District Court for the Western District of New York (Siragusa, J.) dismissed the claims, ruling that they were barred by Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). We assume the parties' familiarity with the underlying facts, the procedural history, and the issues presented for review.

[1]     Shapard also brought claims against other prison officials. Those claims were dismissed on separate grounds and are not at issue in this appeal.

Shapard's complaint, filed pro se in 2008, alleges that on June 7, 2005, the three officers punched and kicked him and beat him with a baton, causing serious physical injuries that required medical treatment. The complaint alleges excessive force in retaliation for grievances Shapard had filed. The complaint also states that prison officials found after a hearing that Shapard had initiated the incident by assaulting one of the officers, John Attea. The complaint itself neither admits nor denies this finding. However, attached to the complaint are various documents that were produced in connection with the incident (including Shapard's grievance submissions and records from the prison disciplinary process), some of which reflect Shapard's contemporaneous denial of wrongdoing. In addition, during his deposition in 2010, Shapard (who was not represented by counsel at the time) denied assaulting Officer Attea.

After the altercation with the officers (but before bringing the present suit), Shapard was charged with second degree assault, in violation of N.Y. Penal Law § 120.05(7). He pleaded guilty, and admitted that "on or about June 7th

of the year 2005 [he] was in the Wende Correctional Facility ... and while therein set in forth actions that ultimately led to the injury of ... Correction Officer John Attea." App'x at 1137-38. Shapard later made an unsuccessful attempt to withdraw his plea and vacate his conviction.

In 2015, approximately five years after the deadline for dispositive motions in Shapard's § 1983 action, the officers moved for leave to file a motion for summary judgment, arguing that Shapard's excessive force claims were barred by Heck because they conflicted with his guilty plea. Defense counsel explained that he "previously failed to recognize the law related to [Shapard's] plea of guilty to assaulting Attea and the ramifications such plea would have on the trial." App'x at 961. The district court found no good cause for the delay and denied the motion. The court nonetheless dismissed Shapard's claims sua sponte. It ruled that although "Heck does not necessarily bar excessive force claims where the plaintiff was convicted of assaulting officers during the same incident[,]" Shapard's version of the facts "clearly impl[ies] the invalidity of his assault conviction, which has not been set aside, and consequently [his claims] are barred by Heck[.]" Shapard v. Attea, No. 08-CV-6146 (CJS), 2016 WL 4001362, at *4–*5 (W.D.N.Y. July 26, 2016), reconsideration denied, 2016 WL 5871360 (W.D.N.Y. Oct. 7, 2016).

**\*2** We review de novo a district court's sua sponte dismissal of claims, accepting the facts alleged in the complaint as true and drawing all inferences in the plaintiff's favor. See Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007). To withstand dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). We will reverse the dismissal if "a liberal reading of the complaint gives any indication that a valid claim might be stated." Larkin v. Savage, 318 F.3d 138, 139 (2d Cir 2003) (per curiam).

Under Heck, a claim that, if successful, would "necessarily imply the invalidity" of the plaintiff's prior state conviction is "not cognizable under § 1983" unless that conviction has already been invalidated. Heck, 512 U.S. at 487, 114 S.Ct. 2364. Shapard's excessive force claims are not Heck-barred because their favorable adjudication would not "necessarily imply the invalidity" of his prior assault conviction. First, the elements of

excessive force and second degree assault under N.Y. Penal Law § 120.05(7) are not incompatible. [2] See Griffin v. Crippen, 193 F.3d 89, 92 (2d Cir. 1999) (holding that appellant's conviction for assaulting prison guards was not incompatible with finding that guards responded with excessive force); Gilbert v. Cook, 512 F.3d 899, 901 (7th Cir. 2008) ("A contention that a guard struck back after being hit is compatible with Heck.").

[2]    The elements of second degree assault under N.Y. Penal Law § 120.05(7) are: (1) while confined in a correctional facility, (2) after having been charged with or convicted of a crime, (3) an individual causes physical injury to another person, (4) with intent to cause such injury. See N.Y. Penal Law § 120.05(7). To state a claim for excessive force, an inmate must establish that a prison official applied force "maliciously and sadistically to cause harm" rather than "in a good-faith effort to maintain or restore discipline." Hudson v. McMillian, 503 U.S. 1, 6, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Second, the complaint does not deny that Shapard assaulted Officer Attea. Although attachments to the complaint reflect Shapard's previous denials, the complaint does not necessarily adopt those denials (which were made years earlier, before Shapard pleaded guilty). A complaint does not necessarily adopt the statements contained in its attachments. See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 675 (2d Cir. 1995) (holding that "[i]t was [ ] error for the district court to assume that plaintiffs' complaint adopted" statements made in an attachment). It is improper to assume adoption when the complaint was filed pro se and the assumption results in dismissal. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006) (requiring that "submissions of a pro se litigant [ ] be construed liberally and interpreted to raise the strongest arguments that they *suggest*" because courts have an "obligation ... to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training" (citations and quotation marks omitted)).

Shapard's claims do not depend on the invalidity of his assault conviction. His counsel (who was retained in February 2014) argued at a March 2014 court conference that although Shapard believed that he did not assault Officer Attea, the use of force applied by the officers would have been excessive even if he had. Shapard reiterated this argument in response to the officers' motion for leave to file for summary judgment:

> **\*3** Plaintiff is aware that the res judicata effect of his guilty plea may prevent him from testifying as to whom initiated the incident that is the subject of this action. However, nothing in Plaintiff's guilty plea or allocution precludes him from testifying as to what happened next, including testifying as to force used against him by the Defendants and testifying as to the injuries he sustained.

App'x at 1279.

Shapard's plausible claim of excessive force can be reconciled with his assault of Officer Attea, and is therefore not barred by Heck. On remand, the district court may take appropriate steps to prevent Shapard from disputing the assault, including limiting his testimony and instructing a jury that he assaulted Officer Attea. See Gilbert, 512 F.3d at 902 ("It would have sufficed to tell the jurors that Gilbert struck the first blow during the fracas at the chuckhole, that any statements to the contrary by Gilbert (as his own lawyer) or a witness must be ignored, and that what the jurors needed to determine was whether the guards used more force than was reasonably necessary to protect themselves from an unruly prisoner.").

For the foregoing reasons, we hereby **VACATE** the judgment of the district court and **REMAND** for further proceedings.

### All Citations

--- Fed.Appx. ----, 2017 WL 4548439

---

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   3

KeyCite Yellow Flag - Negative Treatment
Distinguished by Carter v. DeKalb County, Georgia, N.D.Ga., October
18, 2012

2011 WL 4478515
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Philip DeBLASIO, Plaintiff,
v.
David ROCK, et al., Defendants.

No. 9:09–CV–1077 (TJM/GHL).
|
Sept. 26, 2011.

**Attorneys and Law Firms**

Philip Deblasio, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Adele M. Taylor–Scott, Esq., of
Counsel, Albany, NY, for Defendants.

**Opinion**

### *MEMORANDUM DECISION AND ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** In this *pro se* prisoner civil rights action, filed pursuant
to 42 U.S.C. § 1983, Plaintiff Philip DeBlasio alleges that
twenty-three employees of the New York Department
of Corrections and Community Supervision ("DOCCS")
violated his constitutional rights by denying him adequate
medical care, interfering with his right to exercise his
religion, subjecting him to excessive force, and subjecting
him to unconstitutional conditions of confinement. (Dkt.
No. 1.) Currently pending is Defendants' motion for
summary judgment. (Dkt. No. 55.) Plaintiff has not
opposed the motion, despite having been advised of the
consequences of failing to do so and having been granted
four extensions of the deadline by which to do so. (Dkt.
No. 55 at 3; Jan. 19, 2011, Text Order; Feb. 16, 2011,
Text Order; Mar. 31, 2011 Text Order; June 27, 2011, Text
Order.) For the reasons that follow, Defendants' motion
for summary judgment is granted in part and denied in
part.

## I. BACKGROUND

Plaintiff, an inmate currently in DOCCS custody at Five
Points Correctional Facility, complains in this action
of a series of events that occurred at Great Meadow
Correctional Facility in 2006 and 2009. (Dkt. No. 1.)

### A. Incidents in 2006

In his verified complaint, Plaintiff alleges that on
December 28, 2006, Defendant Physician Assistant Fisher
Nesmith stopped at his cell during sick-call rounds. (Dkt.
No. 1 at 11.) Plaintiff told Defendant Nesmith that he
needed to see the doctor for his chronic back pain and
herniated discs. *Id.* Defendant Nesmith would not allow
Plaintiff to see the doctor. *Id.* at 12. This happened
"several times" again after December 28, 2006. *Id.*

Plaintiff alleges that on December 28, 2006, Defendant
Correction Officer Kevin Holden was assigned to pack
Plaintiff's personal belongings because Plaintiff was
moving to a new cell. (Dkt. No. 1 at 12.) Thereafter, pages
were missing from each of Plaintiff's three copies of the
Koran. *Id.* One of the three Korans had to be destroyed
because it was missing so many pages. *Id.* Plaintiff alleges
that Defendant Holden is "defin[i]tely responsible" for the
missing pages because he "was the only person to pack
[P]laintiff's property ..." *Id.*

### B. Incident with Extraction Team

Plaintiff alleges that one night in early August 2009 [1],
he complained of sharp pains in his left ribcage area
and blood in his urine. [2] (Dkt. No. 1 at 12.) Defendant
Correction Officer Kelsey Lenney told Plaintiff he would
call a nurse. [3] *Id.* After speaking with Defendant Nurse Della
Howley, Defendant Lenney returned twenty minutes later
and asked Plaintiff if he had requested a sick call. *Id.* at
12–13. Plaintiff was enraged and started banging the gate
and asking to see a sergeant. *Id.* at 13. When Defendant
Sergeant John Busse responded to the scene, Plaintiff
explained the situation and Defendant Busse said he
would take care of it. *Id.* Two hours after Plaintiff had first
complained of the pain, Defendant Howley arrived at his
cell "with a very negative attitude." *Id.* Plaintiff "was so
mad she wouldn't help him [that] he threw water at her and
hit [Defendant] Lt. Richard Juckett as well." *Id.*

DeBlasio v. Rock, Not Reported in F.Supp.2d (2011)
Case 9:13-cv-01271-DNH-TWD   Document 85   Filed 02/16/18   Page 53 of 98
2011 WL 4478515

[1]   Plaintiff's allegations about the precise dates on which the incidents in the complaint occurred are contradictory. Early in the complaint, he alleges that he complained of the pain in his ribcage on "8–7–09." (Dkt. No. 1 at 12.) Later in the complaint, he says that "the next day" after the event was "9–7–09" and refers to it as "Friday morning of the same day." (Dkt. No. 1 at 14.) September 7, 2009, was a Monday. August 7, 2009, was a Friday. These discrepancies need not be resolved because the precise dates are irrelevant to the issues in this case.

[2]   Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.)

[3]   Defendant Lenney declares that he did, indeed, call Defendant Howley about Plaintiff. (Dkt. No. 55–9 ¶ 4.) Defendant Howley declares that she does not recall having a conversation with "the Correction Officer on duty" but that she remembers receiving a telephone call from Defendant Juckett asking her to check on Plaintiff. (Dkt. No. 56 ¶¶ 6–7.)

**\*2** After Plaintiff threw the water, an extraction team was mobilized to remove him from his cell. (Dkt. No. 1 at 13.) This team included Defendant Juckett, Defendant Busse, Defendant Correction Officer Adam Rivers, Defendant Lenney, Defendant Correction Officer Richard Dempster, and Defendant Correction Officer Richard Buell. *Id.*

According to Plaintiff, Defendant Juckett told Plaintiff that "he was going to OBS[4] one way or the other" even if Defendant Juckett "had to drag [P]laintiff out of the cell himself." *Id.* Plaintiff told Defendant Juckett that he was "not suicidal and should be sent to F–Block" as originally scheduled. *Id.* Defendant Juckett "was then just about to spray [P]laintiff in the face when [P]laintiff pleaded with him to take him out without gas[s]ing him ..." *Id.* In the complaint, Plaintiff alleges that the extraction team moved him to an observation room and then beat him with sticks, their fists, and their feet. *Id.* At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.)

[4]   The Residential Crisis Treatment Program, often referred to as "OBS," is a special observation area for inmates who cannot be controlled by security officers or who become unmanageable, suicidal, or homicidal. (Dkt. No. 55–2 ¶¶ 4–5.)

Defendants assert that they did not use any force on Plaintiff. Defendant Dempster declares that the only physical contact that any member of the extraction team had with Plaintiff during the cell extraction was when Defendant Buell placed Plaintiff's wrists and legs in restraints. (Dkt. No. 55–5 ¶ 10; Dkt. No. 55–8 ¶ 18.) Defendant Dempster declares that Plaintiff "voluntarily complied with [a] strip frisk, which is standard procedure for inmates being processed into" the mental health unit. (Dkt. No. 55–5 ¶ 12; Dkt. No. 55–8 ¶¶ 20–21.) After that was done, the team "escorted [P]laintiff to an observation cell," which was "accomplished without incident." (Dkt. No. 55–5 ¶¶ 13–14.) Defendant Juckett declares that "[t]he only physical contact that I or any member of the extraction team had with Inmate DeBlasio that day was to place him in restraints, conduct a pat frisk, and be present when the inmate was subject to strip frisk." (Dkt. No. 55–8 ¶ 25.) Defendant Lenney declares that he "had no physical contact with inmate DeBlasio at all." (Dkt. No. 55–9 ¶ 20.) Defendant Rivers declares that he "had no physical contact with inmate DeBlasio during this engagement." (Dkt. No. 55–11 ¶ 13.)

After Plaintiff was secured in the observation cell, the extraction team members left the area, returned to their regular duties, and did not see Plaintiff again that day. (Dkt. No. 55–5 ¶¶ 15–16; Dkt. No. 55–3 ¶¶ 13–14; Dkt. No. 55–8 ¶ 22; Dkt. No. 55–9 ¶ 21; Dkt. No. 55–1 ¶ 12.) No paperwork was prepared documenting a use of force. (Dkt. No. 55–11 ¶ 14.) It is standard procedure to prepare a Use of Force Report when force is used on an inmate. *Id.*

Plaintiff alleges that after the extraction team left, he remained in the observation cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.) At his deposition he testified that he suffered only from "discomfort [and] bruises" as a result of the incident. (Dkt. No. 55–16 at 83:6–8.) About twenty-four hours after the incident, Plaintiff complained to an officer of chest pains. (Dkt. No. 56 at 2 ¶ 15, 5.) Plaintiff allowed Defendant Howley to examine him. *Id.* Plaintiff told Defendant Howley only that he had indigestion. *Id.* Defendant Howley found that Plaintiff had "no signs of distress." *Id.*

### C. Incident at Conference Room
**\*3** The day after the incident with the extraction team, Defendant Correction Officer Scott Hamel escorted Plaintiff to a conference room to be interviewed by

DeBlasio v. Rock, Not Reported in F.Supp.2d (2011)
Case 9:13-cv-01271-DNH-TWD Document 85 Filed 02/16/18 Page 54 of 98
2011 WL 4478515

Defendant Dr. Battu [5] and Defendant Social Worker Sarah Wetherell. [6] (Dkt. No. 1 at 14.) Dr. Battu had been asked to see Plaintiff to "possibly prescribe medications to control his behavior or adjust medications that were already prescribed." (Dkt. No. 55–2 ¶ 9.) Dr. Battu often performs such interviews alone, but was accompanied by Defendant Wetherell "[b]ecause of the violent nature of this inmate." *Id.* ¶ 10. Defendant Wetherell had "worked with [P]laintiff for a number of years ... and [was] familiar with his history and patterns of behavior." (Dkt. No. 55–20 ¶ 3.) Defendant Wetherell declares that the RCTP Coordinator was also present. (Dkt. No. 55–20 ¶ 13.)

[5]     The parties spell this defendant's name in a variety of ways. In his declaration, he refers to himself as Kalyana Battu. (Dkt. No. 55–2 at 1.) Therefore, I have used that spelling.

[6]     The parties spell this defendant's name in a variety of ways. In her declaration, she refers to herself as Sarah Wetherell. (Dkt. No. 55–20 at 1.) Therefore, I have used that spelling.

Defendant Sergeant Crispin Murray declares that he supervised Defendant Hamel as he escorted Plaintiff to the appointment. (Dkt. No. 55–10 ¶ 5.) Once Plaintiff was in the conference room, Defendant Murray moved to a desk several feet away from the door to the room. (*Id.* ¶ 6; Dkt. No. 55–2 ¶ 11.)

Plaintiff alleges that he told Defendants Battu and Wetherell about the incident with the extraction team. (Dkt. No. 1 at 14.) He alleges that Defendant Battu said that it was none of his concern because he was just "there to handle medications and suicide prevention" and that because Plaintiff threw water at Defendant Howley he "may have deserved" what happened. *Id.* Plaintiff alleges that Defendant Wetherell "refused to comment or help [Plaintiff] in any way at all." *Id.* Plaintiff alleges that he called Defendant Wetherell "a snake sellout C.O. bitch" and she stormed out of the room and talked to Defendant Correction Officer Scott Hamel. *Id.* Dr. Battu declares that Plaintiff "became verbally abusive to Sarah Wetherell, nearly bringing her to tears, and when I tried to calm him down, [P]laintiff became abusive toward me." (Dkt. No. 55–2 ¶ 14.) Dr. Battu declares that Plaintiff's behavior "brought the interview to an end. The officer waiting outside moved in and escorted [P]laintiff out." (Dkt. No. 55–2 ¶ 15.) Defendant Wetherell declares that when "the session started to get

hostile, the RCTP Coordinator stood up, and in doing so triggered a prearranged signal to security personnel to move in." (Dkt. No. 55–20 ¶ 19.)

Plaintiff alleges that Defendant Hamel entered the conference room and rushed Plaintiff into a cell. (Dkt. No. 1 at 14.) Defendant Hamel declares that he entered the conference room because "I believe I observed [Plaintiff] stand up during the interview in disobedience of my direct order to him not to do so. When the inmate stood up, I automatically moved in, took control of the restraints, and escorted him out of the room and back to his observation cell." (Dkt. No. 55–7 ¶ 9.) Defendant Murray declares that when a "problem occurred in the interview room," he supervised Defendant Hamel as Defendant Hamel escorted Plaintiff back to his cell and Defendant Stemp joined them "to provide additional security coverage." (Dkt. No. 55–10 ¶¶ 7–9.)

**\*4** The parties dispute what happened next. Defendant Hamel declares that before he placed Plaintiff in his cell, he asked him if he wanted to take a shower because inmates in the observation unit generally take showers on Mondays, Wednesdays, and Fridays. (Dkt. No. 55–7 ¶ 10.) Defendant Hamel declares that Plaintiff declined and then turned and head-butted him, hitting Defendant Hamel's forehead just over his left eye and splitting the skin open. *Id.* ¶ 11. Defendants Murray and Stemp also declare that Plaintiff head-butted Defendant Hamel. (Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Defendant Hamel declares that he "instinctively" pushed Plaintiff "forward and down to the floor with my left hand" and that Plaintiff banged his head on the way down. (Dkt. No. 55–7 ¶ 12.) Defendant Hamel declares that Plaintiff did not stay down and kept kicking and trying to bite Defendant Hamel. *Id.* ¶ 13. Defendant Murray declares that he ordered Defendant Stemp to "go in and pull the inmate out of the cell so they could get control of him." (Dkt. No. 55–10 ¶ 13.) Defendant Hamel declares that he and Defendant Stemp "used the wrist restraints to lift [Plaintiff] out of the cell and onto the floor in the hallway." (Dkt. No. 55–7 ¶ 16.) Defendant Hamel declares that once Plaintiff was on the floor in the hallway, he took control of Plaintiff's legs while Defendant Stemp took control of Plaintiff's upper body. *Id.* ¶ 17. Defendant Stemp declares that he took control of Plaintiff's upper body by putting one knee on his back and the other on his head until he calmed down. (Dkt. No. 55–19 ¶ 10.) Defendant Hamel declares that Plaintiff calmed down and

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4478515

they all remained that way until Defendant Hamel and Defendant Stemp were relieved by other staff. (Dkt. No. 55–7 ¶ 18.)

Defendant Stemp declares that he "used only such force as was necessary to subdue the inmate. Nobody kicked, punched or otherwise asserted unnecessary force against" Plaintiff. (Dkt. No. 55–19 ¶ 13.) Defendant Murray declares that he "personally did not have any physical contact with the inmate." (Dkt. No. 55–10 ¶ 16.) Defendant Murray declares that given Plaintiff's "unprovoked assault on the escorting officer, his attempts to further assault the officer during the course of the take-down, and his refusal to comply with staff direction, I do not believe that ... the actions of the men under my supervision violated any of [P]laintiff's federally protected rights." *Id.* ¶ 21.

Plaintiff's version of this incident is quite different. In his verified complaint, Plaintiff alleges that after Defendant Hamel escorted him to his cell, Defendants Stemp and Murray came into the cell. (Dkt. No. 1 at 14.) Plaintiff alleges that Defendant Murray removed Plaintiff's handcuffs, said "how tough are you now disrespecting Nurse Howley and Wetherell and Dr. Battu," and slapped Plaintiff on the left side of his face with an open hand. *Id.* All of the officers then beat Plaintiff, got him onto his stomach, handcuffed him, and kicked him several more times in the face, head, and body. *Id.* at 14–15. At his deposition, Plaintiff testified that he did not do anything to any of the officers until Defendant Murray removed his handcuffs and punched him in the face. Plaintiff testified that it was only then that "I put my hands up and I started fighting with him." (Dkt. No. 55–16 at 99:12–100:17.)

**\*5** When the relief officers arrived, Defendants Murray, Stemp, and Hamel escorted Plaintiff to the clinic to be examined for injuries. (Dkt. No. 55–10 ¶ 17.) Plaintiff and the officers were examined and photographed and Defendant Murray completed a Use of Force Report. (Dkt. No. 55–10 ¶ 18.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

### D. Conditions of Confinement

Plaintiff alleges that after this incident he was subjected to various harsh conditions of confinement. (Dkt. No. 1 at 15.)

#### 1. *Handcuff Incident with Defendant Segovis*

Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Roswell Segovis handcuffed Plaintiff to take him to the shower. (Dkt. No. 1 at 15.) Defendant Segovis noticed that Plaintiff was wearing socks and refused to let him shower. *Id.* He then left Plaintiff handcuffed in his cell for five hours. *Id .* Plaintiff pleaded with Defendant Segovis to remove the handcuffs so that he could use the bathroom. *Id.* Defendant Segovis refused and after several hours Plaintiff "had no choice but to wet his pants and then defecate on himself." *Id.* Defendant Segovis declares that he left Plaintiff handcuffed because Plaintiff "took the handcuffs hostage and refused to put his hands through the feed-up slot so that they could be removed." (Dkt. No. 55–18 ¶ 4.)

Later, Defendant Segovis issued a misbehavior report charging Plaintiff with committing an unhygienic act. (Dkt. No. 1 at 15.) The hearing officer sentenced Plaintiff to seven days of restricted diet. *Id.* Defendant First Deputy Superintendent Jeffrey Tedford "co-signed" the order for restricted diet. *Id.* The punishment "was brought to the attention" of Defendant Sergeant David Winchip, who "was going along with the entire [charade]." *Id.*

#### 2. *Hot Water*

Plaintiff alleges that he was not able to get hot water because he was not given a bucket. (Dkt. No. 1 at 17.) On August 19, 2009, Plaintiff asked Defendant Sergeant Peter DePalo for hot water. (Dkt. No. 1 at 17.) Defendant DePalo said "Muslims don't deserve hot water. You'll get that when you get to hell." *Id.* On August 24, 2009, Plaintiff told a watch commander, in the presence of Defendant Winchip, that he was not receiving hot water. *Id.* at 18. Defendant Winchip said he would see to it that Plaintiff got a bucket for hot water. *Id.* Later that day, Defendant Winchip came to Plaintiff's cell and said "You won't get that bucket[ ] today you dirty white Muslim wigger." *Id.*

#### 3. *Drinking Water*

Plaintiff alleges that he once went without water for a week. (Dkt. No. 1 at 15.) He alleges that during the week

that he went without water, Defendant Correction Officer William Powers was responsible for turning on Plaintiff's water and failed to do so. (Dkt. No. 1 at 6.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150: 2–5, 6–9.)

### 4. *Food*

**\*6** Plaintiff alleges that on August 18, 2009, Defendant Correction Officer Alan White and Defendant Segovis played with Plaintiff's breakfast tray and Plaintiff had to plead with them in order to get it. (Dkt. No. 1 at 16.) At lunch [7] Defendant White gave Plaintiff only a quarter cup of juice to drink and no lunch tray. *Id.* Later, Defendant DePalo came to Plaintiff's cell asking for the empty lunch tray. *Id.* Plaintiff told him that he was never given a lunch tray. *Id.* Defendant DePalo looked under Plaintiff's bed and did not see a tray. *Id.* That night at dinner an officer served Plaintiff a special diet loaf instead of regular food and told him that he would receive it for seven days as punishment for not giving back his lunch tray. *Id.* This punishment was ordered by Defendants White and Segovis and "co-signed" by Defendant DePalo. *Id.* at 17. Plaintiff asserts that Defendants White and Segovis "have a history" with him and "blatantly harass[ed]" Plaintiff "to disturb his Fast of Ramadan." *Id.* at 16–17.

[7]    It is unclear when Plaintiff went to lunch on August 18, 2009, because, as discussed above, he alleges that he was handcuffed in his cell from 8:00 a.m. to 1:00 p.m. (Dkt. No. 1 at 15.)

Plaintiff alleges that on one occasion, Defendant Segovis gave Plaintiff pork instead of the special diet loaf. *Id.* Defendant Segovis said "You know you want to eat some swine." *Id.* at 18.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed to move outside his cell at all when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.)

### 6. *Showers*

Plaintiff alleges that on one occasion, Defendant Segovis would not allow Plaintiff to shower. *Id.* When Plaintiff reported this to Defendant DePalo, he said "That's life in F-block for Muslims." *Id.*

### 7. *Bibles*

Plaintiff alleges that on August 31, 2009, a chaplain came to Plaintiff's cell to deliver two Bibles. (Dkt. No. 1 at 16.) Defendants Powers and Segovis told the chaplain to leave the Bibles and that they would give them to Plaintiff when they were not busy. *Id.* Defendant Powers came to Plaintiff's cell and "said [he] was banging all day." *Id.* Plaintiff said it was not him who was banging. *Id.* Defendant Powers said he would investigate and that Plaintiff would not be getting his Bibles. *Id.* On or about September 8, 2009, Defendant Powers came to Plaintiff's cell, told him he had discovered that it was not Plaintiff who was banging, and apologized. *Id.* However, he did not give Plaintiff his Bibles. *Id.* The record shows that Plaintiff received the Bibles on September 12, 2009. [8] (Dkt. No. 55–6 at 28.)

[8]    Plaintiff signed the complaint in this action on September 10, 2009. (Dkt. No. 1.) Thus, he had not received the Bibles when he wrote the complaint. Because Plaintiff has not opposed the motion for summary judgment, it is unclear whether he wishes to continue asserting the claim regarding the Bibles.

### E. Restrictions on Religious Practice

Plaintiff claims that Defendant Superintendent David Rock and Defendant CORC Director Karen Bellamy violated his religious rights in three ways. (Dkt. No. 1 at 18.) First, he alleges that he was not allowed to demonstratively pray in the BHU recreation pen. *Id* . Plaintiff alleges that Defendant Rock allows Christians to pray but "is obviously discriminating against the Muslims" by prohibiting demonstrative prayer. *Id.* at 18–19. Second, he alleges that BHU and SHU inmates are not allowed to have razors, which prevents Muslims from shaving their pubic and armpit hair as required by their faith. *Id.* at 19. Third, Plaintiff alleges that he is not given Halal food. *Id.*

### F. Procedural History

**\*7**    Plaintiff filed his complaint in this Court on September 23, 2009. (Dkt. No. 1.) Plaintiff's complaint sets forth three causes of action: (1) religious discrimination; (2) "assault and cruel and unusual punishment at the hands of DOCS workers"; and (3) a request that Plaintiff receive "proper medical attention at all times." (Dkt. No. 1 at 20.) Plaintiff requests injunctive relief (being allowed to pray in the recreation pen, being

**DeBlasio v. Rock, Not Reported in F.Supp.2d (2011)**
Case 9:13-cv-01271-DNH-TWD   Document 85   Filed 02/16/18   Page 57 of 98

2011 WL 4478515

allowed to shave his pubic hair, and given Halal food) and damages. *Id.* at 21.

Defendants now move for summary judgment. (Dkt. No. 55.) Plaintiff has not opposed the motion.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [9] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

[9]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine whether any facts are disputed in the record presented on the defendants' motion, and (2) determine whether, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.,*

140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*8** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable

inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. Failure to Exhaust Administrative Remedies Regarding Claims Against Defendants Nesmith and Holden

Plaintiff alleges that Defendant Nesmith would not allow Plaintiff to see a doctor for back pain and that Defendant Holden ripped pages from Plaintiff's Korans. (Dkt. No. 1 at 11–12.) Defendants argue that these claims should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 55–23 at 13–14.) Defendants are correct.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010).

**\*9** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at (c).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at (d).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Jeffrey Hale, the Assistant Director of the Inmate Grievance Program for DOCCS, declares that there "are no CORC appeal records that correspond to the December 28, 2006, events as alleged in [P]laintiff's complaint regarding back pain or the loss of personal or religious property at the Great Meadow Correctional Facility." (Dkt. No. 55–6 ¶ 7.) CORC records show that Plaintiff did not file any CORC appeals between October 2006 and October 2008. (Dkt. No. 55–6 at 5.) Indeed, Plaintiff admitted at his deposition that he did not properly exhaust his administrative remedies regarding Defendant Holden's alleged desecration of the Korans. [10] (Dkt. No. 55–16 at 57:17–58:5.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Nesmith and Holden.

10    Plaintiff was not able to recall any of the details about the incident with Defendant Nesmith. (Dkt. No. 55–16 at 37–41.)

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). [11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

11    The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**\*10** Here, as discussed above, an administrative remedy was available to Plaintiff. Defendants preserved the exhaustion defense by asserting it in their answer to the complaint. (Dkt. No. 39 ¶ 18.) The record before the Court on this unopposed motion for summary judgment indicates neither that Defendants should be estopped from asserting the defense nor any special circumstances justifying Plaintiff's failure to exhaust his administrative remedies. Therefore, the Court grants Defendants' motion for summary judgment dismissing the claims against Defendants Nesmith and Holden.

**B. Claims Regarding Failure to Provide Medical Care**

Plaintiff alleges that Defendants Buell, Busse, Dempster, Howley, Juckett, Lenney, and Rivers [12] failed to provide him with adequate medical care. (Dkt. No. 1at 11–14.) Defendants argue that there are "neither objective nor subjective facts to support Plaintiff's conclusory medical indifference claim." (Dkt. No. 55–23 at 14–17.) Defendants are correct.

12    Defendants characterize the complaint as asserting Eighth Amendment medical care claims against only Defendants Nesmith, Howley, and Battu. (Dkt. No. 55–23 at 14.)

*1. Defendants Lenney, Busse, and Howley*
Plaintiff alleges that Defendants Lenney, Busse, and Howley failed to adequately respond to his complaints of ribcage pain and blood in his urine. (Dkt. No. 1 at 12–13.)

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

The undisputed facts show that Plaintiff did not suffer from a serious medical condition. A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. Here, Plaintiff alleges that he complained to Defendants Lenney, Busse, and Howley of "sharp pains in his left ribcage area and the pissing of

blood." (Dkt. No. 1 at 12.) Defendant Lenney declares that Plaintiff complained to him of pain in his side but did not mention anything about blood in his urine. (Dkt. No. 55–9 ¶¶ 4–5.) When Plaintiff allowed Defendant Howley to examine him the next day, he stated only that he had indigestion. (Dkt. No. 56 at 5.) There is no evidence that Plaintiff's ribcage pain and the blood he reported in his urine significantly affected his daily activities or caused him chronic and substantial pain. The record before the Court, therefore, does not reflect that Plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain."

 **\*11**  Even if Plaintiff had raised a triable issue as to the objective prong of his Eighth Amendment medical care claim against Defendants Lenney, Busse, and Howley, the Court would grant summary judgment on this claim because Plaintiff has not raised a triable issue of fact that any of these Defendants were deliberately indifferent to his medical needs. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

Defendants Lenney and Busse are correction officers, not medical staff members. (Dkt. No. 1 at 8; Dkt. No. 55–9 ¶ 1.) "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999). Here, as discussed above, there is no evidence that Plaintiff was in "extreme pain." Moreover, the undisputed facts show that neither Defendant Lenney nor Defendant Busse intentionally delayed Plaintiff's access to medical care. Defendant Lenney declares that he called Defendant Howley regarding Plaintiff's complaints of pain. (Dkt. No. 55–9 ¶ 4.) By Plaintiff's own admission, Defendant Howley came to his cell two hours after he first complained of pain. (Dkt. No. 1 at 13.) A two-hour wait for medical care is not the type of delay that indicates deliberate indifference. *See Baumann,* 36 F.Supp.2d at 512 (denying defendants' motion to dismiss where plaintiff alleged that correction officer delayed care for his injured arm for three weeks). Therefore, the Court grants Defendants' motion for summary judgment and

dismisses the Eighth Amendment medical care claims against Defendants Lenney and Busse.

Regarding Defendant Howley, to establish deliberate indifference on the part of medical staff, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). The undisputed facts show that Defendant Howley came to Plaintiff's cell to tend to his pain but that Plaintiff threw toilet water on her before she could examine him. (Dkt. No. 1 at 13; Dkt. No. 56 ¶ 11.) Thus, the undisputed facts show that the failure to provide immediate care to Plaintiff was the result of his own conduct rather than any conscious and intentional disregard on the part of Defendant Howley. Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claim against Defendant Howley.

### 2. *Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers*

 **\*12**  Plaintiff alleges that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) violated his Eighth Amendment rights by leaving him in a cell all night without any medical attention or treatment. (Dkt. No. 1 at 13.)

The undisputed facts show that Plaintiff did not suffer from any serious medical condition as a result of the incident with the extraction team. Plaintiff testified that he suffered from "discomfort [and] bruises" from the incident. (Dkt. No. 55–16 at 83:6–8.) Superficial injuries such as bruises are not "serious medical conditions." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D.N.Y.2010). Therefore, the Court grants Defendants' motion for summary judgment and dismisses the Eighth Amendment medical care claims against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers.

### C. Excessive Force Claim Against the Extraction Team

Plaintiff claims that the members of the extraction team (Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers) used excessive force. (Dkt. No. 1 at 13.) Defendants do not explicitly address Plaintiff's Eighth Amendment excessive force claim regarding the extraction team, although their memorandum of law requests "that [P]laintiff's complaint be dismissed, *in its entirety,* and without leave to replead" and states, in the section regarding medical care, that "the extraction team did not use any force against [P]laintiff." (Dkt. No. 55–23 at 16 and 30, emphasis added.) The Court finds that Plaintiff has, just barely, raised a triable issue of material fact on this issue.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9.

**\*13** Here, Plaintiff's verified complaint alleges that the members of the extraction team beat Plaintiff with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) At his deposition, Plaintiff testified that the members of the extraction team beat him with their fists for about a minute. (Dkt. No. 55–16 at 84:17–24, 86:24–87:10.) If Plaintiff's version of events is credited, Defendants' use of force was more than *de minimis* despite the fact that Plaintiff suffered only bruises and discomfort as a result. *Cf. Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 471 (S.D.N.Y.1998) (kicking an inmate's ankles and feet during a pat frisk is *de minimis* and insufficient to rise to the level of a constitutional violation); *Show v. Patterson,* 955 F.Supp. 182, 192–93 (S.D.N.Y.1997) (pushing inmate against wall with hands and no use of weapons *de minimis* use of force); *Anderson v. Sullivan,* 702 F.Supp. 424, 425–27 (S.D.N.Y.1988) (pushing inmate's face into a bar while applying handcuffs not significantly disproportional to the goal of handcuffing plaintiff).

Defendants flatly contradict Plaintiff's version of events. The members of the extraction team declare that the only physical contact any of them had with Plaintiff was to place him in restraints, pat frisk him, and strip frisk him. (Dkt. No. 55–8 ¶ 25; Dkt. No. 55–9 ¶ 20; Dkt. No. 55–11 ¶ 13.)

Given these conflicting versions of events, the Court is called upon to weigh the parties' credibility. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). Under this exception, in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete" and the plaintiff's evidence is contradicted by evidence produced by the defendants, the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

Here, although Plaintiff is relying exclusively on his own testimony and his evidence is contradicted by evidence produced by Defendants, the *Jeffreys* exception does not apply because Plaintiff's testimony is not "contradictory and incomplete." The complaint and deposition testimony are moderately contradictory. In the complaint, Plaintiff alleges that the extraction team members beat him with sticks, their fists, and their feet. (Dkt. No. 1 at 13.) However, at his deposition, Plaintiff testified that the team members hit him only with their fists. (Dkt. No. 56–16 at 84:17–19.) However, this is far less contradictory than the plaintiff's statements in *Jeffreys.* There, the plaintiff, who alleged that a group of police officers beat him and threw him out a third-floor window, confessed on at least three occasions that he had jumped rather than having been thrown. *Jeffreys,* 426 F.3d at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Plaintiff's deposition and complaint are also far less contradictory than cases in which courts have applied *Jeffreys* to make credibility determinations at the summary judgment stage. *See Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, at *24–26, 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (collecting cases). [13] Therefore, although this is a very close question, the Court finds that Plaintiff has raised a triable issue of fact that Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers used excessive force against him. Accordingly, the Court denies Defendants' motion for summary judgment dismissing this claim.

[13]   The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### D. Claims Against Defendants Battu and Wetherell

**\*14**  Plaintiff alleges that he reported the incident with the extraction team to Defendants Battu and Wetherell, that they refused to get involved, and that Defendant Battu told him that he may have deserved the way he was treated. (Dkt. No. 1 at 14.) Defendants move to dismiss these claims, arguing that Plaintiff has failed to allege that Defendants Battu and Wetherell were personally involved in any constitutional violation. (Dkt. No. 55–23 at 11–12.) Plaintiff's allegations against Defendant Battu and Wetherell are properly analyzed as a failure-to-intervene claim. On that claim, summary judgment in favor of Defendants is appropriate.

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a reasonable jury could not conclude that Defendants Battu and Wetherell failed to intervene with an ongoing constitutional violation. The undisputed facts show that Plaintiff did not tell Defendants Battu and Wetherell about the incident with the extraction team until several hours after it was over. (Dkt. No. 1 at 13–14.) Even if one fully credits Plaintiff's version of events, Defendants Battu and Wetherell did not have any realistic opportunity to intervene and prevent the harm. Therefore, Defendants' motion for summary judgment dismissing the claims against Defendants Battu and Wetherell is granted.

### E. Excessive Force Claim Against Defendants Hamel, Murray, and Stemp

Plaintiff contends that Defendants Hamel, Murray, and Stemp subjected him to excessive force as directed by Defendants Battu and Wetherell. (Dkt. No. 1 at 14–15; Dkt. No. 55–16 at 93:14–95:3.) Defendants' memorandum of law does not address this excessive force claim.

DeBlasio v. Rock, Not Reported in F.Supp.2d (2011)
Case 9:13-cv-01271-DNH-TWD   Document 85   Filed 02/16/18   Page 63 of 98
2011 WL 4478515

As discussed above in Section I(C), the parties dispute what happened when Plaintiff was removed from the conference room. Plaintiff alleges that Defendants Hamel, Murray, and Stemp beat him and then kicked him while he was handcuffed. (Dkt. No. 1 at 14–15.) Defendants contend that Plaintiff head-butted Defendant Hamel without provocation and that they used only enough force to bring him under control. (Dkt. No. 55–7 ¶ 11; Dkt. No. 55–10 ¶ 10; Dkt. No. 55–19 ¶ 6.) Medical records show that Plaintiff suffered bruises on his right shoulder, red cheeks, a quarter-sized bump on his scalp, two raised areas on the back of his scalp, and a bruised ear. (Dkt. No. 55–7 at 7.)

**\*15** Given the parties' conflicting versions of events and Defendants' failure to address the claim, the Court finds that the excessive force claim against Hamel, Murray, and Stemp survives summary judgment.

However, there is no competent evidence that Defendants Battu and Wetherell were involved in the incident. Although Plaintiff claims that they ordered the use of force, he does not have any personal knowledge to support that opinion. To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1999) (citations omitted). Therefore, the claim that Defendants Battu and Wetherell ordered Defendants Hamel, Murray, and Stemp to beat Plaintiff is dismissed.

### F. Conditions of Confinement Claims

Plaintiff alleges that Defendants DePalo, Powers, Segovis, Tedford [14], White, and Winchip subjected him to cruel and unusual punishment by subjecting him to harsh conditions of confinement. [15] (Dkt. No. 1 at 15–18.) Defendants argue that Plaintiff has "failed to allege a plausible Eighth Amendment claim" regarding the conditions of his confinement. (Dkt. No. 55–23 at 17–20.)

[14] Defendants do not address the claim against Defendant Tedford.

[15] Plaintiff does not assert that Defendants subjected him to these conditions of confinement in retaliation for any protected conduct. (Dkt. No. 1 at 20.) Therefore, I will address the conditions of confinement claims solely under Eighth Amendment standards.

### 1. Handcuff Incident with Defendant Segovis

Plaintiff alleges that Defendant Segovis violated his Eighth Amendment rights by leaving Plaintiff handcuffed in his cell for five hours while Plaintiff pleaded to be un-handcuffed so he could use the bathroom. (Dkt. No. 1 at 15.) Defendants argue that this claim should be dismissed because there is "neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform a cell extraction to retrieve [the handcuffs]." (Dkt. No. 55–23 at 19.) Defendants are not entitled to summary judgment on this claim because Plaintiff's verified complaint raises a triable issue of fact that Defendant Segovis subjected him to unconstitutional conditions of confinement.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. Estelle v. Gamble, 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Farmer, 511 U.S. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

**\*16** To satisfy the objective component of an Eighth Amendment conditions of confinement claim, "the

deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

To satisfy the subjective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Defendants' extremely spare argument regarding Plaintiff's claim against Defendant Segovis states, in full:

> Plaintiff alleges that on August 18, 2009, he presented himself for shower in socks and was left locked in the cell with handcuffs on for several hours by Defendant Segovis. The only reason security staff would leave an inmate handcuff[ed] in their cell is if they "kidnapped" the cuffs, and [P]laintiff refused to put his hand and wrists through the modified feed-up slot to allow the officer Segovis to remove the cuffs. Once again, [P]laintiff's refusal to comply with staff direction and facility procedures resulted in a reasonable and foreseeable deprivation. These facts, moreover, provide neither an objective nor a subjective basis for assigning Eighth Amendment liability. Leaving [P]laintiff in the cell handcuffed behind his back for several hours was a much safer alternative than having to perform[ ] a cell extraction to retrieve them, for both [P]laintiff and staff. Plaintiff was not subjected to a serious risk of harm, and the circumstance was not the result of deliberate indifference to inmate health or safety such as to give rise to an Eighth Amendment cause of action. *Gaston v. Coughlin,* 249 F.2d at 16.

(Dkt. No. 55–23 at 19, citations to record omitted.) Defendants do not address Plaintiff's allegation that he pleaded with Defendant Segovis to release him from his handcuffs so that he could use the bathroom or his allegation that he ultimately urinated and defecated on himself.

Defendants cite only *Gaston v. Coughlin,* 249 F.3d 156 (2d Cir.2001)[16] to support their argument. In that case, the Second Circuit held that a triable issue of fact existed on a conditions of confinement claim where the prisoner alleged that, *inter alia,* the area directly in front of his cell was filled with human feces, urine, and sewage water for several days. Although it is not entirely clear, Defendants may be arguing that Plaintiff's claim should be dismissed because his allegations are not as dire as those asserted by the plaintiff in *Gaston.* However, a reasonable juror, if he or she credited Plaintiff's version of events, could find that being handcuffed for five hours while pleading to be released in order to use the bathroom is an extreme deprivation. Similarly, a reasonable juror who credited Plaintiff's version of events could find that Defendant Segovis was deliberately indifferent. Therefore, Defendants' motion for summary judgment dismissing the claim against Defendant Segovis regarding the handcuffing incident is denied.

16    As noted in the block citation, Defendants cite this case as "249 F.2d at 16." (Dkt. No. 55–23 at 19.)

### 2. *Hot Water*

**\*17** Plaintiff alleges that he was denied hot water on several occasions. (Dkt. No. 1 at 17.) Defendants move for summary judgment, arguing that the claim should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. The denial of hot water in an inmate's cell fails

**DeBlasio v. Rock, Not Reported in F.Supp.2d (2011)**
Case 9:13-cv-01271-DNH-TWD  Document 85  Filed 02/16/18  Page 65 of 98
2011 WL 4478515

to state an Eighth Amendment claim because it does "not constitute [a] serious deprivation[ ] of basic human needs." *Graham v. Perez,* 121 F.Supp.2d 317, 323 (S.D.N.Y.2000). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim that Defendants violated his Eighth Amendment rights by failing to provide him with a bucket for hot water is granted.

### 3. *Drinking Water*

Plaintiff's complaint alleges that he was denied drinking water in his cell for a week. (Dkt. No. 1 at 15.) In his complaint and at his deposition, Plaintiff alleged that Defendant Powers was responsible for this deprivation because he failed to turn Plaintiff's water on. (Dkt. No. 1 at 16; Dkt. No. 55–16 at 152:18–19.) At his deposition, Plaintiff testified that Defendant Segovis was also responsible. (Dkt. No. 55–16 at 150:3–5, 9–12.) Defendants' memorandum of law does not discuss this claim.

Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects. *Compare Johnson v. Comm'r of Corr. Servs.,* 669 F.Supp. 1071, 1074 (S.D.N.Y.1988) (prisoner confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals) *with Atkins v. County of Orange,* 372 F.Supp.2d 377, 406 (S.D.N.Y.2005) (inmate raised triable issue of fact that the defendants subjected her to unconstitutional conditions of confinement by depriving her of water in her cell for almost one month despite fact that they provided her with fluids at meals where medical records showed inmate suffered adverse effects from water deprivation). Here, Plaintiff received juice at meals. (Dkt. No. 55–16 at 152:9–13.) There is no evidence that Plaintiff suffered any adverse effects from water deprivation. Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the deprivation of drinking water.

### 4. *Food*

Plaintiff alleges that Defendants interfered with his food on several occasions. Specifically, he alleges that (1) Defendants White and Segovis forced Plaintiff to plead with them before they gave him his breakfast tray on August 18, 2009 (Dkt. No. 1 at 16); (2) Defendant White gave Plaintiff only juice for lunch one day (Dkt. No. 1

at 16); Defendants White, Segovis, DePalo, and Tedford punished him by restricting him to a special loaf diet (Dkt. No. 1 at 15, 16–17); and (4) Defendant Segovis gave him pork instead of his special diet on one occasion (Dkt. No. 1 at 18). Defendants move for summary judgment dismissing these claims, arguing that "such deprivations are *de minimis* and do not rise to a level of constitutional significance ..." (Dkt. No. 55–23 at 18.) Defendants are correct.

**\*18** Plaintiff's allegations that he was denied food at lunch one day, given a diet he did not like as punishment, and given food that his religion does not allow him to eat on one occasion are insufficient to raise a triable issue of fact that Defendants violated his Eighth Amendment rights. *See Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal); *Shakur v. Selsky,* 391 F.3d 106 (2d Cir.2004) (prisoner stated *First Amendment* claim where he alleged that he was denied one religiously significant feast). Therefore, the Court dismisses Plaintiff's Eighth Amendment claims regarding the denial of food.

To the extent that Plaintiff claims that the imposition of the loaf diet violated his right to due process, the claim is *sua sponte* dismissed. In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, any due process claim regarding the loaf diet is dismissed.

### 5. *Recreation and Movement*

Plaintiff alleges that he was not allowed "any recreation or any movement outside his cell" when Defendant Segovis was assigned to his block. (Dkt. No. 1 at 17.) Defendants do not address this claim in their memorandum of law. [17]

[17] Although Defendants do not discuss the issue in their memorandum of law, Defendant Segovis declares that inmates in the Special Housing Unit have one recreation period per day, for which they are required to sign up in advance. (Dkt. No. 55–18 ¶ 16.) Defendant Segovis escorts any inmates who sign up to recreation. *Id.* ¶ 17. Defendant Segovis declares that Plaintiff "rarely signed up for recreation" during his shift. *Id.* ¶ 18.

Prisoners have the right under the Eighth Amendment to be allowed "some opportunity for exercise." *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996). Plaintiff's complaint, however, does not plausibly allege facts suggesting that this right was violated. Interference with prisoners' recreation must be quite severe in order to state an Eighth Amendment claim. *See Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (officers who denied inmate outdoor exercise for twenty-two days did not violate Eighth Amendment). Therefore, the Court *sua sponte* dismisses Plaintiff's claims regarding the denial of recreation and movement.

### 6. *Showers*

Plaintiff alleges that Defendant Segovis would not allow him to shower on August 19, 2009. (Dkt. No. 1 at 17.) Plaintiff alleges that when he told Defendant DePalo that he had not been allowed to shower, Defendant DePalo said "That's life in F-block for Muslims." *Id.* Defendants do not address this claim in their memorandum of law. [18]

[18] Although Defendants' memorandum of law does not address this claim, Defendant DePalo declares that at "no time did I derogate [P]laintiff's religion or act in an unprofessional manner toward him ." (Dkt. No. 55–4 ¶ 23.)

**\*19** The denial of one shower does not violate the Eighth Amendment. *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs' "). Therefore, the Court dismisses Plaintiff's claim *sua sponte.*

### 7. *Bibles*

Plaintiff alleges that Defendants Segovis and Powers refused to give Plaintiff two Bibles that a chaplain delivered for him. (Dkt. No. 1 at 16.) Defendants' memorandum of law does not address this claim.

The allegation about the Bibles fails to state an Eighth Amendment claim because Plaintiff does not plausibly allege that he was denied "the minimal civilized measure of life's necessities" as a result of the deprivation. The Court can find no authority suggesting that even a permanent deprivation of the Bibles would rise to that level. Here, Plaintiff received the Bibles twelve days after the chaplain originally delivered them. (Dkt. No. 55–6 at 28.) Therefore, Plaintiff's Eighth Amendment claim regarding the Bibles is *sua sponte* dismissed.

The allegation about the Bibles also fails to state a procedural due process claim. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, Plaintiff's claim regarding the deprivation of the two Bibles is dismissed.

### 8. *Verbal Abuse*

Defendants argue that, to the extent that Plaintiff alleges that his constitutional rights were violated by comments by Defendants DePalo and Winchip regarding Muslims, such claims should be dismissed. (Dkt. No. 55–23 at 20.) Defendants are correct. Verbal harassment, in and

of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996)* ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, Defendants' motion for summary judgment dismissing these claims is granted.

### G. Religion Claims

**\*20** Plaintiff alleges that Defendants Rock and Bellamy [19] violated his right to exercise his religion. (Dkt. No. 1 at 18–19.) Defendants move for summary judgment of these claims. (Dkt. No. 55–23 at 20–28.)

[19]   Plaintiff alleges that Defendants Rock and Bellamy are responsible for violating his religious rights. (Dkt. No. 1 at 18.) Defendant Rock, who was the Superintendent of Great Meadow when Plaintiff was incarcerated there, was "responsible for the overall administrative functioning of the facility." (Dkt. No. 55–12 ¶ 3 .) He was therefore personally involved in the implementation of the Directive at Great Meadow. The evidence does not show, however, any personal involvement by Defendant Bellamy with implementation of the Directive at Great Meadow. Defendant Bellamy is the Director of the Inmate Grievance Program. (Dkt. No. 55–6 ¶ 12.) Therefore, Defendants' motion for summary judgment dismissing the claims against Defendant Bellamy for lack of personal involvement (Dkt. No. 55–23 at 12) is granted. Hereafter, I will refer to Plaintiff's religion claims as being brought solely against Defendant Rock.

### 1. *Meals*

Plaintiff alleges that Defendant Rock violated his right to exercise his religion because Great Meadow Correctional Facility does not provide a Halal diet. (Dkt. No. 1 at 19.) Defendants move for summary judgment dismissing this claim, arguing that the religious alternative meals provided at Great Meadow meet Plaintiff's religious dietary requirements. (Dkt. No. 55–23.) Defendants are correct.

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free

exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws." *Muhammad v. Warithu–Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul–Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)). [20]

[20]   Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 105.)

Defendant Rock declares that DOCCS "has proscribed the use of what is called a [ ] Religious Alternative Meal program to accommodate non[-]Kosher religious dietary requirements." (Dkt. No. 55–12 ¶ 47.) He further declares that the alternative meal "provides a nutritionally adequate diet and meets Islamic requirements regardless of sect." *Id.* ¶ 50. Courts have consistently held that DOCCS' Religious Alternative Meal is sufficient to sustain Muslim prisoners' good health without violating dietary laws and that a strictly Halal diet is not required. *Muhammad,* 98 F.Supp.2d at 343–44 (collecting cases). Therefore, Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the failure to provide Halal meals is granted.

### 2. *Restrictions on Demonstrative Prayer*

DOCCS Directives limit prisoners' freedom to demonstratively pray. Specifically, DOCCS Directive 4202(k) states that "[i]ndividual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent." (Dkt. No. 55–12 ¶ 9.) Plaintiff argues that the Directive as implemented at Great Meadow violates his right to practice his religion. (Dkt. No. 1 at 18, 20.) Defendants argue that this claim should be dismissed. (Dkt. No. 55–23 at 25–26.) The Court will address this claim under both the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

#### a. *First Amendment*

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). However, due to the unique concerns of the

DeBlasio v. Rock, Not Reported in F.Supp.2d (2011)
Case 9:13-cv-01271-DNH-TWD    Document 85    Filed 02/16/18    Page 68 of 98
2011 WL 4478515

prison setting, prisoners' free exercise rights must be
balanced against the interests of prison officials engaged
in the complex duties of administering the penal system.
*Id.* Thus, a prison regulation that denies a prisoner
the ability to engage in a religious exercise "is judged
under a reasonableness test less restrictive than that
ordinarily applied [to burdens on fundamental rights]:
a regulation that burdens a [prisoner's] protected right
passes constitutional muster if it is reasonably related to
legitimate penological interests." *Salahuddin v. Goord,* 467
F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of
Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d
282 (1987) (punctuation omitted).

**\*21**  To establish a free exercise claim, a prisoner
"must show at the threshold that the disputed conduct
substantially burdens [21] his sincerely held religious
beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352
F.3d at 591). A religious belief is "sincerely held" when
the plaintiff subjectively, sincerely holds a particular belief
that is religious in nature [22] . *Ford,* 352 F.3d at 590. Here,
there is no dispute that Plaintiff sincerely believes that his
religion requires him to demonstratively pray several times
each day.

[21]  Although the Second Circuit has applied the
"substantial burden" test in its most recent prison free
exercise cases, it has done so while explicitly refusing
to adopt or endorse the test. "The *Ford* court noted
that the Circuits apparently are split over whether
prisoners must show a substantial burden on their
religious exercise in order to maintain free exercise
claims. Nevertheless, the *Ford* court held that since
the plaintiff had not challenged the application of
the substantial burden requirement, the court would
proceed as if the requirement applied. Likewise,
the *Salahuddin* court noted that '[r]esolution of this
appeal does not require us to address Salahuddin's
argument that a prisoner's First Amendment free-
exercise claim is not governed by the 'substantial
burden' threshold requirement,' because defendants
'never proceed to argue that we should find any
particular burdened religious practice to be peripheral
or tangential to [plaintiff's] religion.' The court then
proceeded as if the substantial burden requirement
applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n.
10 (S.D.N.Y.2008) (citations and some punctuation
omitted).

[22]  However, in some cases "an asserted belief might be
so bizarre, so clearly nonreligious in motivation, so

as not to be entitled to protection." *Frazee v. Illinois
Dept. Of Employment Security,* 489 U.S. 829, 834 n.
2, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989).

A prisoner's sincerely held religious belief is "substantially
burdened" "where the state puts substantial pressure
on an adherent to modify his behavior and to violate
his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d
Cir.1996) (punctuation omitted) (holding that Rastafarian
prisoner's sincerely held religious belief that he was
prohibited from submitting to a test for latent tuberculosis
was "substantially burdened" where he was forced to
choose between "submitting to the test or adhering to [his]
beliefs and enduring medical keeplock.").

Defendants argue that the Directive does not substantially
burden Plaintiff's sincerely held religious beliefs because
Plaintiff "has also admitted that prayer times do not
always coincide with recreation times and that he is only
forced to choose occasionally." (Dkt. No. 55–23 at 26,
citing Dkt. No. 55–16 (Plaintiff's deposition) at 164–65.)

Defendant Rock declares that:

> An inmate housed at Great Meadow
> who wishes to pray during his
> recreation period has alternatives
> to demonstrative prayer in the
> yard. First, the inmate can make
> silent, non-demonstrative prayers
> while in Great Meadow's recreation
> yard. In addition, an inmate may
> choose to remain in his cell during
> the recreation period and, while
> in his cell, the inmate may pray
> demonstratively as he wishes. An
> inmate may choose to go back to
> his cell during a designated "go
> back," whereby inmates may return
> to their cells from the recreation
> yard under the supervision of staff
> at a scheduled time. "Go Back"
> periods, however, are limited, and
> may not coincide with the exact
> point in time that an inmate wishes
> to perform the Salaah, inasmuch as
> inmates must be escorted while they
> are transported from the recreation
> yard to their cells, and vice versa,
> and [ ] only a finite number of

correction officers work at Great
Meadow at any time.

(Dkt. No. 55–12 ¶¶ 24–28.)

Defendant Rock asserted the same argument in *Smith v. Artus,* No. 9:07–CV–1150, 2010 U.S. Dist. LEXIS 104660, 2010 WL 3910086 (N.D.N.Y. Sept.30, 2010).[23] There, Judge Mordue found that:

[23]    Defendants served a copy of this unpublished decision on Plaintiff with their moving papers. (Dkt. No. 55–23 at 120.)

The question therefore becomes whether having to choose between attending recreation ... or fulfilling his obligation to pray Salaah in a demonstrative manner would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, when viewed in the light most favorable to plaintiff, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

**\*22** *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*36–37, 2010 WL 3910086, at \*12. Judge Mordue's analysis is persuasive and thus the Court finds that there is a triable issue of fact that the Directive substantially burdened Plaintiff's sincere religious beliefs.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 275.

Defendant Rock's declaration discusses, at length, the penological interests on which the Directive is based. Specifically, he declares that:

Demonstrative prayer singles individuals out as members of a particular religious group. This is particularly true of Muslim inmates performing the Salaah, which includes, among other things, kneeling down, bending forward, touching the forehead to the ground, and motioning with the hands and arms. When inmates of a particular faith are involved in an incident, other inmates of the same faith are likely to involve themselves in the incident to protect someone from "their group." Identification of inmates' religious

affiliation has also been known to lead to conflicts between different faith groups or different sects within a faith group. These conflicts can escalate rapidly placing staff and other inmates at serious risk of physical injury or death, and threaten the facility's overall security. In the recreation yard, where hundreds of inmates are gathered at one time, this easily could lead to large-scale violent incidents. During the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison.

Demonstrative prayer in the yard also negatively impacts staff's ability to control inmates. When an inmate is engaged in demonstrative prayer in the recreation yard, that inmate is likely to ignore legitimate direct orders from staff. The inmate praying demonstratively may view the interruption as an insult to his or her religion, and the perceived insult may lead to conflict between staff and the inmate. Staff may be hesitant to interrupt an inmate engaged in demonstrative prayer out of respect for the religious significance of the prayer, and thus be impeded in their attempt to communicate necessary information to the inmate or carry out direct orders or tasks associated with that inmate. This, in turn, disrupts the order of the facility and may adversely impact related safety concerns. As noted above, because the inmate's religion has been identified by his demonstrative prayer, when these conflicts occur, other inmates may join in the conflict, rapidly escalating the situation. Whether the inmate ignores a direct order or staff is unwilling to disrupt prayer, the end result is a diminution of staff's control over the recreation yard and an increased risk to the safety and security of the facility.

**\*23** I am informed by my attorneys that plaintiff is asserting that these security concerns do not apply to inmates housed in the Behavioral Health Unit (BHU) because they are isolated during recreation periods. However, the fact that inmates in BHU and the Special Housing Unit (SHU) [ ] take recreation in isolated recreation yards does not significantly alter these security and staffing concerns. The recreation yards adjacent to the BHU and SHU are small pens designed for use by one inmate at a time. They abut one another, and although solitary, they are not private and may be observed by other members of the inmate population. Thus, the religious preferences of inmates engaging in demonstrative pray[er] in the BHU and SHU recreation yards would still be identifiable by other inmates,

and staff would still have diminished control over inmates praying demonstratively. Moreover, from an administrative perspective, it is better to require staff to apply Directive 4202 across the board to all members of the inmate population without exception. In this way, both staff and inmates know exactly what is allowed and what is not allowed. There are no errors of discretion, no favors, no favoritism, and no room for inmates in general population to become disruptive as a result of their belief that inmates in BHU or SHU are receiving special privileges.

(Dkt. No. 55–12 ¶¶ 11–34.)

Judge Mordue concluded in *Smith* that the security concerns identified by Defendant Rock satisfied the burden of showing that legitimate penological interests supported the Directive's ban on demonstrative prayer in the recreation yards at Great Meadow. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *41–42, 2010 WL 3910086, at * 14. The undersigned agrees. "Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); s*ee also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007).

Therefore, the burden shifts to Plaintiff to show that the concerns articulated by Defendant Rock are irrational. *Salahuddin,* 467 F.3d at 275. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274–75.

Defendant Rock declares here, as he did in *Smith,* that the Directive's ban on demonstrative prayer in recreation yard at Great Meadow is rational because:

**\*24** Great Meadow's "big recreation yard is approximately 5 acres, and during a typical recreation period, between 100 and 400 inmates are present in the yard, depending on the weather. In the morning, one sergeant and six correction officers are assigned to the yard to supervise the inmates during recreation. In the afternoon, one sergeant and eight correction officers are assigned to the yard and in the evening, one sergeant and twelve correction officers are assigned to the yard. In these large areas of a facility such as the yard or the mess hall, prisoners substantially outnumber staff, and these are areas of a facility where unusual incidents such as serious fights and assaults will typically occur. BHU and SHU recreation periods run on parallel schedules. Fewer staff are assigned because BHU and SHU inmates are released to the yard individually but must be escorted by at least two officers. BHU and SHU populations, even though isolated from the general population, tend to be more unpredictable and difficult to control. These populations often present greater safety and security risks for staff. When an inmate becomes involved in a conflict situation in one area of the facility, staff must be diverted from other areas of the facility to back up the staff assigned to the location where the incident is occurring. During recreation periods the diversion of staff away from more populated areas or escort responsibilities to address incidents with BHU or SHU inmates can be dangerous, and creates critical security concerns. During such incidents, inmates and staff are placed at risk of sustaining serious physical injury or death. Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison. It is imperative, therefore, that rules and regulations designed to minimize the potential for conflict, and the drain on human resources be implemented, across the board, without exception. This is particularly true in the current economic climate as, upon information and belief, there are no resources available to hire additional facility staff, and DOCS is being encouraged to reduce the number of hours that staff may work overtime.

(Dkt. No. 55–12 ¶¶ 36–45.)

In *Smith,* the plaintiff opposed the defendants' motion for summary judgment. In his opposition, the plaintiff argued that the Directive's ban on demonstrative prayer in the recreation yard at Great Meadow was an irrational response to the concerns articulated by Defendant Rock because (1) the Directive contains other provisions explicitly allowing religious behaviors that single out members of particular faith groups, such as wearing distinctive head coverings and facial hair and being served

on different colored trays in the mess hall; (2) officers are just as likely to lose control over inmates praying non-demonstratively, which is allowed under the Directive, as they are over inmates praying demonstratively; (3) other activities in the recreation yard—such as sports—also lead to conflict but are permitted; and (4) demonstrative prayer is allowed in the recreation yards at other facilities. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*42–26, 2010 WL 3910086, at \* 14–15. Judge Mordue found that the plaintiff had raised a triable issue of fact that the Directive was an irrational response to the facility's legitimate penological interests. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*47–48, 2010 WL 3910086, at \*16.

**\*25** In *Smith,* the plaintiff asserted that the alternatives that the facility offered to praying in the recreation yard—namely, non-demonstrative prayer or staying in his cell at recreation time to pray-were not reasonable. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*48–53, 2010 WL 3910086, at \*16–17. Judge Mordue found that the plaintiff had raised a triable issue of fact regarding the reasonableness of the facility's alternatives. *Id.*

In *Smith,* Judge Mordue found that the same issues that raised a triable issue of fact regarding the rationality of the Directive also raised a triable issue regarding the third *Turner* factor, which considers the impact on guards, inmates, and prison resources. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*53–54, 2010 WL 3910086, at \*17.

Finally, in *Smith* the plaintiff proposed alternatives to the Directive's ban on demonstrative prayer in the recreation yard-for instances, adding an additional "Go Back" period for Muslim inmates or setting aside an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*54–56, 2010 WL 3910086, at \*18. Judge Mordue found that Plaintiff had raised a triable issue of fact that the facility could accommodate Muslims' need to demonstratively pray by designating an area of the recreation yard for prayer. *Smith,* 2010 U.S. Dist. LEXIS 104660, at \*57–58, 2010 WL 3910086, at \*19.

Thus, in *Smith,* Judge Mordue found that there was a triable issue of fact that the very policy challenged by Plaintiff in this case-Great Meadow's implementation of DOCCS Directive 4202(k) banning demonstrative prayer in the recreation yard-violated Muslim inmates' free exercise rights.

However, unlike the plaintiff in *Smith,* Plaintiff here has not opposed Defendants' motion for summary judgment. Thus, Plaintiff here has not met his burden of showing that the concerns articulated by Defendant Rock are irrational.

Even if Plaintiff had opposed the motion and met his burden, Defendants would be entitled to summary judgment on Plaintiff's free exercise claim because (1) the doctrine of qualified immunity shields them from liability for damages; and (2) Plaintiff's request for injunctive relief is moot.

The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)). A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); accord, *Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). In the context of religion claims, the Supreme Court and the Second Circuit have "expressly cautioned against framing the constitutional right at too broad a level of generality." *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The Second Circuit imposes a " 'reasonable specificity' requirement on defining the contours of a constitutional right for qualified immunity purposes." *Id.* Thus, conduct does not violate clearly established rights unless the Supreme Court or the Second Circuit has quite specifically held that conduct is unconstitutional. *Id.*

**\*26** Here, neither the Second Circuit nor the Supreme Court has held that the policy against demonstrative prayer in the solitary recreation pen at Great Meadow Correctional Facility violates prisoners' rights under the First Amendment or RLUIPA. Indeed, *Smith* appears to be the only case on the issue. Even if *Smith* was sufficient to create "clearly established statutory or constitutional rights," it would have no effect here because it was

decided after Plaintiff filed this action. Moreover, Judge Mordue dismissed the plaintiff's action in *Smith* on the basis of qualified immunity because "it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard." *Smith,* 2010 U.S. Dist. LEXIS 104660, at *88, 2010 WL 3910086, at *29. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim for money damages regarding demonstrative prayer.

Defendants argue that Plaintiff's claims for injunctive relief are moot because he is no longer housed at Great Meadow. (Dkt. No. 55–23 at 10–11.) Defendants are correct. "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Plaintiff has not been housed at Great Meadow since October 2009. (Dkt. No. 7.) Therefore, his request for injunctive relief is moot.

Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment claim regarding the ban on demonstrative prayer is granted.

### b. *RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [24] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

[24]   An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

In *Smith,* Judge Mordue found that the plaintiff had raised a triable issue of fact that Great Meadows' ban on demonstrative prayer violated RLUIPA for the same reasons that he articulated regarding the First Amendment. *Smith,* 2010 U.S. Dist. LEXIS 104660, at *58–62, 2010 WL 3910086, at *19–20. However, he found that the defendants were entitled to qualified immunity.

*Smith,* 2010 U.S. Dist. LEXIS 104660, at *89, 2010 WL 3910086, at *29.

Here, even if Plaintiff had raised a triable issue of fact, Defendants would be entitled to summary judgment dismissing the RLUIPA claim for two reasons. First, money damages are not available under RLUIPA. *Sossamon v. Texas,* ——U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Second, as discussed above, Plaintiff's claims for injunctive relief are moot. Therefore, Defendants' motion for summary judgment dismissing Plaintiff's RLUIPA claim regarding the ban on demonstrative prayer is granted.

### 3. *Access to Personal Razor*

**\*27**   Plaintiff alleges that Defendants violated his religious rights by refusing to allow him a razor or clippers to shave his pubic hair and armpits. (Dkt. No. 1 at 19.) Defendants argue that their refusal to give Plaintiff a personal razor is supported by legitimate health and safety concerns because inmates in the SHU and BHU, where Plaintiff resided at Great Meadow, "are there because they have threatened to ... commit suicide, inflict self harm, or because they have assaulted staff or other inmates." (Dkt. No. 55–23 at 27.) Even if Plaintiff had raised a triable issue of fact regarding the merits of this claim, Defendants are entitled to summary judgment on the basis of qualified immunity. The Court can find no Supreme Court or Second Circuit authority holding that prisoners are entitled to possess a personal razor or clippers to perform grooming mandated by their religion. Additionally, as discussed above, Plaintiff's requests for injunctive relief are moot because he is no longer housed at Great Meadow. Therefore, Defendants' motion for summary judgment dismissing this claim is granted.

### H. Claim Against Defendant Karandy

Defendants argue that complaint fails to state that Defendant Karandy was personally involved in any of the alleged constitutional violations. (Dkt. No. 52–33 at 11–12.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause

of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Here, the complaint includes Defendant Karandy in the list of defendants but does not contain any allegations about any acts or omissions by Defendant Karandy. (Dkt. No. 1 at 9.) Therefore, I grant Defendants' motion for summary judgment and dismiss the claim against Defendant Karandy.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 55) is ***GRANTED IN PART AND DENIED IN PART.*** All claims are dismissed with the exception of: (1) the excessive force claim against Defendants Buell, Busse, Dempster, Juckett, Lenney, and Rivers; (2) the excessive force claim against Defendants Hamel, Murray, and Stemp; and (3) the claim against Defendant Segovis regarding the handcuffing incident; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy *Butler v. Gonzalez,* No. 09 Civ.1916, 2010 U.S. Dist. LEXIS 108244, 2010 WL 3398156 (S.D.N.Y. May 18, 2010) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4478515

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

Attorneys and Law Firms

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

Opinion

### MEMORANDUM DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged

personal involvement in the August 8, 2011 assault are
*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

[1]     This is the fourth civil rights action filed by Plaintiff
in this District. Generally, two of these actions arose
out of Plaintiff's refusal to consent to a strip search
and the subsequent actions taken against Plaintiff
as a result of his refusal. *See Groves v. New York,*
09–CV–0406, Decision and Order (N.D.N.Y. filed
May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
*Groves v. The State of New York,* 9:09–CV–0412,
Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
(Sharpe, J.) (granting defendants' motion to dismiss
the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
The third action alleged numerous violations of
Plaintiff's constitutional rights during the period July
23, 2009, and August 26, 2009, and was dismissed
without prejudice upon Plaintiff's request in October,
2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
(Suddaby, J.). As a result, it does not appear that
the current action is barred because of res judicata,
collateral estoppel, and/or the rule against duplicative
litigation.

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take

appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2      At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*
Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT
In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

3      The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard
**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008)

(McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550

U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted]. Rule 8 "demands more than an unadorned,

the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

[4]    *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

[7]   *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983

claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the

assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the

evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).) [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever

care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt

to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10]   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

**3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan**

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11]   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008

WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).[13]

[12]    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on

the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and

reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request

for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion

at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10** **ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;***[15] and it is further

[15]    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is ***DENIED* without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize

are *sua sponte* **DISMISSED** **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED** **without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED** **without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General,

together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 946703
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Corey FORD, Plaintiff,

v.

William E. PHILLIPS, Superintendent of Green
Haven Correctional Facility; Guiney, Deputy
Superintendent; Matthew Miller, Corrections
Officer; Franklin W. Middleton, Corrections
Officer; S. Phillip, Corrections Officer; D. McClenning,
Corrections Officer, J. Erns, Corrections Officer; D.
Huttel, Corrections Officer; C. Austin, Corrections
Officer; L. Czyzewski, Corrections Officer; R.
Myers, Sergeant; D. Carey, Sergeant; John Doe #
1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly,
Deputy Superintendent; Bipin Bhavsar, Medical
Doctor; Kimbler, Sergeant; Jewett, Sergeant;
Alfred Vacca, Inspector General, individually
and in their official capacities, Defendants.[1]

[1]    This caption reflects the caption in plaintiff's
Complaint. Defendants did not provide the Court
with a full, corrected caption.

No. 05 Civ. 6646(NRB).
|
March 27, 2007.

**Attorneys and Law Firms**

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

**Opinion**

### MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of

the Department of Correctional Services ("DOCS"),
pursuant to 42 U.S.C. § 1983, alleging: (1) excessive
force; (2) denial of recreation, showers, special meals and
property; (3) deliberate indifference to a serious medical
need; and (4) mail interference, all in violation of his
constitutional rights. Ford moved for summary judgment
on July 24, 2006 and defendants cross-moved for summary
judgment on December 22, 2006.[2] For the reasons stated
below, we deny Ford's motion for summary judgment and
grant defendants' motion for summary judgment in part.

[2]    Although the title of Ford's motion is "Motion
for Partial Summary Judgment", his papers
clearly argue for judgment on all of the claims
raised in his Complaint. Defendants' motion for
summary judgment expressly applies to Ford's entire
Complaint.

*BACKGROUND*[3]

[3]    Unless otherwise noted, the following facts are not in
controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April
and May of 2004.[4] In the early afternoon of April 14,
2004, at approximately 12:30 p.m., Ford exited his cell
without permission when a corrections officer unlocked
the door for Ford's cellmate.[5] After leaving his cell, Ford
headed directly for Officer Miller, who was writing passes
for inmates.[6] As Ford later admitted,[7] Ford then threw
hot oil on Officer Miller, burning his face, head, eye, neck,
shoulders and chest, and repeatedly stabbed Officer Miller
with a homemade shank measuring approximately nine
inches in length. As he was attacked by Ford, Officer
Miller repeatedly screamed, "Get him off me!"[8]

[4]    Plaintiff is currently incarcerated and serving a
sentence of twelve and one-half to twenty-five
years, having plead guilty to attempted murder,
kidnapping and a weapons violation. *See* Declaration
of Efthimios Parasidis ("Parasidis Decl."), dated
December 22, 2006.

[5]    *See* Parasidis Decl., Ex. B, FORD 42. Earlier that
day, Officer McClenning observed Ford yelling from

his cell gate and generally being disrespectful. *Id.* at FORD 39.

[6]     *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

[7]     *Id.,* Ex. E., FORD IG 26-29, 290-295.

[8]     *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ').

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[13]

[9]     *Id.*

[10]    *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

[11]    *Id.* at FORD 45-46.

[12]    *Id.* at FORD 1-2, 21-22, 43.

[13]    *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004[14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[15] Ford

further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[16]

[14]    Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

[15]    *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

[16]    *Id.* at 7.

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

B. Ford's Escort to Special Housing
**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[19]

[17]    Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

[18]    *Id.*

[19]    Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he

sustained "extreme and numerous abrasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

## C. Ford's Post-Incident Medical Treatment

Upon his arrival at Special Housing, Ford was examined by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back. [20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time. [21]

[20]   Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

[21]   *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood. [22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon. [23] After examining Ford, Dr. Bhavsar ordered a urine analysis [24] and prescribed Tylenol. [25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis. [26] Both urine analyses found evidence of blood. [27]

[22]   *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

[23]   *Id.*

[24]   *Id.;* Ex. G (Bhavsar Decl.) at 1.

[25]   *Id.*

[26]   *Id.* at FORD MEDICAL 25; Ex. G at 2.

[27]   *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists. [28] The

staff determined that Ford had "no obvious loss of dexterity." [29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement. [30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution. [31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change." [32]

[28]   *Id.*

[29]   *Id.*

[30]   *Id.* at FORD MEDICAL 24; Ex. G at 9.

[31]   *Id.* at FORD MEDICAL 37.

[32]   *Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004. [33] The CAT-scan results were negative. [34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit. [35]

[33]   *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

[34]   *Id.* (Ford's "renal parenchyma and collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

[35]   *Id.,* Ex. C, FORD GRIEVANCE 34.

**\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004. [36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in

excruciating pain, "never received medical attention". [37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion. [38]

[36]    *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

[37]    *Id.*

[38]    *Id.*

### D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities. [39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others. [40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004. [41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April 23, 2004. [42]

[39]    Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

[40]    *Id.*

[41]    *Id.*

[42]    *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexiglass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper. [43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days. [44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sargeants ignored his complaints. [45]

[43]    *See e.g.* Complaint at 10.

[44]    *Id.*

[45]    *Id.* at 10-11.

### E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy. [46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [48]

[46]    Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

[47]    *Id.,* Ex. E, FORD IG 316-324.

[48]    *Id.* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend. [49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him. [50]

[49]    Compl. at 13-14.

[50]    *Id.* at 15.

### DISCUSSION

### A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex*

*Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981); *accord Abrams v. United States,* 797 F.2d 100, 103 (2d Cir.1986). However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Patrick v. LeFevre,* 745 F.2d 153, 160 (2d Cir.1984).

## B. Analysis

### 1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York,* 316 F.3d 93 (2d Cir.2002); *see also Kentucky v. Graham,* 473 U.S. 159 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 28 n. 1 (2d Cir.1991) (department that is

an agency of the state is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo,* 502 U.S. 21, 27-31 (1991) (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

### 2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wonton infliction of pain. *Hudson v. McMillian et al.,* 503 U.S. 1 (1992) (citing *Whitley v. Albers,* 475 U.S. 312 (1986)). Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley,* 475 U.S. at 320. Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id.* at 320-21; *Hudson,* 503 U.S. at 7 (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005) (citing *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985) and *Estate of Kenneth Jackson v.. Rochester,* 705 F.Supp. 779, 783 (W.D.N.Y.1989)).

#### a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning, without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14,

2004 and that corrections officers "verbally counseled" Ford without using any force. [51]

[51]  See e.g. Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim [52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic. [53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004. [54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris' sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

[52]  Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

[53]  Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally

alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

[54]  Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey Ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

**\*6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect, [55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..." [56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

[55]  See supra note 51.

[56]  Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me

(sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another.[57] Moreover, Ford's signed and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *de minimus* use of force to one about a brutal, unprovoked beating.

[57]  *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

**b. Attack on Officer Miller**
**\*7** Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee,* 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[59]

[58]  *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

[59]  Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

**c. Transfer to Special Housing**
Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him,

that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

[60]    Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the

morning attack, this version is consistent with Ford's Post-Incident Statements.[61]

[61]    Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[62]

[62]    As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[64]

[63]    Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

64 Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his transfer to Special Housing. *See supra* note 59.

#### d. Due Process

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

#### 3. Deprivations

**\*9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

#### a. Cruel and Unusual Punishment

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and, objectively, the inmate's deprivation must have been

sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others. 65 Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

65 See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, \*1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and

unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care.[66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

[66]    *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

### b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472 (1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1996) (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under

section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin,* 956 F .Supp. 454, 469 (S.D.N.Y.1997).

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order",

dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

> In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [67]

[67]    Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [68]

[68]    *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [69]

[69]    We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

**4. Deliberate Indifference to a Serious Medical Need**

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see e.g. Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); Gomez v. Zwillinger, 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

**\*12** The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002

WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [70]

[70] The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [71]

[71]   *Id.*

**13** As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. [72]

[72] Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained

more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

### 5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail interference.

### a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[74] This is especially true in

light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal and post-trial proceedings.[75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

[73] *See* Ford Brief at 22-23; *see also* Complaint at 25.

[74] Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

[75] *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

### b. First Amendment

**\*14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a

logical connection to the decision to impose a mail watch on a prisoner").

76      At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault. 77 In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. 78

77      *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

78      *Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without any evidence offered to support such an allegation, and given defendants' affidavits and

documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures, 79 no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

79      *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

**\*15** Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

[80]    Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

[81]    Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it found that Ford deserved nothing more.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 946703

---